BERTHA TODD, Executrix of the Estate
of Terrell G. Todd et al *v.* KEVIN
DALE WEIKLE, etc. et al.

[No. 845, September Term, 1976.]

*Decided July 8, 1977.*

664

The cause was argued before THOMPSON, MOORE and MELVIN, JJ.

*Charles E. Iliff, Jr.,* and *Donald L. DeVries, Jr.,* with whom were *John H. Mudd* and *Semmes, Bowen & Semmes* on the brief, for appellants.

*Philip O. Foard* and *Joseph L. Johnson,* with whom were *Stephen M. Hearne* and *White, Mindel, Clarke & Hill* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

In this wrongful death action arising out of the crash of a Cessna Skymaster into South Mountain near Burkittsville, in Frederick County, one of the primary issues is that of pilot identity, that is, who among the occupants was operating the aircraft at the time of the fatal crash when the

plane was equipped with dual controls and there were no survivors or eyewitnesses.

Appellees, the surviving husband and 10 year old son of Antha Lea Weikle, recovered a judgment after a jury trial in the Circuit Court for Frederick County (Clapp, J., presiding) in the total aggregate sum of $235,000.[1] Appellants, defendants below, are the executrix of the estate of Terrell G. Todd, and the owner of the aircraft, the Wilcox Manufacturing Company. The case had been submitted to the jury upon five separate issues.[2] Appellents' motion for judgment *n.o.v.* was denied. On appeal they contend that there was no proof as to the identity of the individual who was actually manipulating the controls of the aircraft at the time of the fatal crash and the trial court should have granted their motion for directed verdict.

In addition, appellants claim that the court committed prejudicial error (a) in allowing hearsay evidence that Mr. Todd did not file an instrument flight plan before takeoff; (b) in failing to instruct that Mr. Todd was entitled to the presumption of due care; and (c) in permitting the jury to find solatium damages on behalf of the minor child of the appellee's decedent.

We find that the surviving child was not entitled to solatium under the provisions of Maryland's Wrongful Death Act, Code, Cts. & Jud. Proc., § 3-901, *et seq.* (1974), and we set aside the jury's verdict for such damages in the amount of $40,000. We otherwise affirm.

I

Marshall Weikle, age 55, and his wife, Antha Lea Weikle, age 27, residents of Beckley, West Virginia, arose early on the morning of September 18, 1971 and left their home at

1. The damages were as follows: Marshall Weikle, the husband, received $100,000 for pecuniary loss and $70,000 for solatium damages; Kevin Dale Weikle, the son, was awarded $25,000 for pecuniary loss and $40,000 for mental grief and suffering.
2. The first issue was phrased: "Was Terrell G. Todd guilty of negligence causing the death of Antha Weikle?" The remaining issues were concerned with the assessment of damages.

6:00 a.m. for the 15-minute drive to the Raleigh County (West Virginia) Memorial Airport. Mrs. Weikle, who had a student flying permit and who, according to her husband, had the "flying bug," had been invited to accompany Terrell G. Todd and Henry E. Brooks, president and sales manager, respectively, of the Wilcox Manufacturing Company, on a business trip to New Jersey in a private plane, a Cessna 337 Skymaster, owned by the company. The plane took off at 6:30 a.m. for the 3-hour flight to Teterboro Airport, near Newark. It was dark at that time and the weather was foggy and misty.[3]

Mr. Todd occupied the front left seat and Mrs. Weikle the right. Mr. Brooks sat in back of them. Mr. Weikle testified that he was within 50 feet of the plane at takeoff and he could observe that Mr. Todd was flying it.

The aircraft was equipped with dual controls and could be operated from either of the front seats. The instruments, however, were located in front of the left seat. Mr. Todd was an experienced, licensed pilot with over 740 hours of flight time. Practically all his flight experience was under Visual Flight Rules (V.F.R.). His experience under bad weather conditions operating under Instrument Flight Rules (I.F.R.) was limited to some 3 hours and 30 minutes. Mrs. Weikle has logged 25 to 30 hours of pilot time as a student, all under visual flight conditions. She had flown before with Mr. Todd and had some 5 hours of instruction time in the Skymaster.

The plane was not heard from for about 3½ hours. At approximately 10:00 a.m., a male voice from the aircraft contacted the Air Traffic Control (A.T.C.) at Dulles Airport in Virginia and made a request to file an instrument approach into the Martinsburg, West Virginia Airport. Upon this initial contact, according to the Dullas A.T.C. tapes played at trial, the Skymaster was about 6 miles northeast of the Martinsburg Airport V.O.R. (The V.O.R. is a radio signal transmitted from a point generally several miles

---

3. A weather briefing was obtained by Mr. Todd from the Raleigh County Airport prior to departure. Apparently, on the basis of this report, Todd telephoned the Weikle residence sometime after 5:00 a.m. to report that the flight was going forward notwithstanding the uncertain weather.

distant from an airport. By locating it, the pilot can position himself for landing.)

For several minutes Dulles' air controller gave the small craft a series of instructions. The plane was instructed to descend to 3,000 feet altitude. As the Skymaster approached the V.O.R., its instructions were then to contact directly the Martinsburg Tower for permission to land. However, before it reached the V.O.R., Dulles lost all radio contact with the plane, which had apparently dropped below 3,000 feet and thus disappeared from the radar screen. No communication was ever established by the plane with the Martinsburg Tower.

The only known witness to the Cessna's tragic final minutes was Henry A. Conway, a retired sea captain residing in Rohrersville, Washington County, Maryland. Standing on his property, he observed the plane as it headed north. He testified that the cloud ceiling was about 400 feet and the plane's altitude was somewhere between 300 and 400 feet. Although the plane, in its original course, would have safely passed between Elk Ridge and South Mountain, two elevations forming Rohrersville Valley, it suddenly made a sharp 90 degree right turn, without banking, towards South Mountain. The witness than lost sight of the plane as it flew into a fog bank. Seconds later, he observed the explosion and heard the crash in which all three occupants were killed instantly.

According to Frederick Michael Fox, the investigator for the National Transportation Safety Board, the weather at the time of the crash was foggy and overcast with a $2^{1}/_{2}$ mile visibility. The accident occurred approximately 12 miles east of the Martinsburg Airport V.O.R. The elevation of South Mountain is 1700 feet. According to Mr. Fox, the path of the debris at the accident site indicated that the plane was flying level and under full power at the time of impact.

The appellees produced an expert witness, Ross C. Nye, to testify concerning the cause or causes of the disaster. Mr. Nye explained the "primary reason" for the crash as follows:

"[T]o get right to the accident itself which

occurred some time after passing the Martinsburg VOR when the pilot was cleared for the approach and is cleared to make a descent to the field; when he accepts that clearance and makes that descent to the field he has essentially two options. One, he can either effect the approach and complete it to a landing or two, he can miss the approach and follow the prescribed missed approach procedure which is climbing left and turn back to the VOR and hold. He obviously didn't make the landing and he obviously didn't make the missed approach because he was twelve miles northeast or correction, east of the VOR at an altitude well below the published missed approach procedure altitude."

As the "secondary reason," he stated:

"I think the whole flight by itself is a cause of the accident in that I think the takeoff was effected under dangerous conditions for the type of flight that was contemplated . . . ."

Appellants offered no testimony. Their evidence consisted of stipulations with respect to actuarial computations on the issue of damages.

On this appeal, no substantive issue is raised with respect to the existence of negligence. Appellants admit that the sharp turn of the Skymaster at a 90 degree angle directly towards South Mountain was the act which resulted in the crash. Their principal contention, however, is that whether Mr. Todd was handling the controls at the time of the fateful turn was a matter of speculation and not a jury question. For the reasons next stated, we disagree.

## II

The standard of proof necessary to establish pilot identity in a dual control aircraft has not previously arisen in Maryland, but it has confronted courts in other jurisdictions. *See, e.g., Udseth v. United States,* 530 F. 2d 860 (10th Cir. 1976); *Boise Payette Lumber Co. v. Larsen,* 214

F. 2d 373 (9th Cir. 1954); *Insurance Company of North America v. Butte Aero Sales & Service,* 243 F. Supp. 276 (D. Mont. 1965); *In Re Hayden's Estate,* 254 P. 2d 813 (Kan. 1953); *Drahmann's Administratrix v. Brink's Administratrix,* 290 S.W.2d 449 (Ky. 1956); *Michigan Aero Club v. Shelley,* 278 N.W. 121 (Mich. 1938); *Lange v. Nelson-Ryan Flight Service, Inc.,* 108 N.W.2d 428 (Minn. 1961); *Mitchell v. Eyre,* 206 N.W.2d 839 (Neb. 1973); *Budgett v. Soo Sky Ways,* 266 N. W. 253 (S.D. 1936); *Towle v. Phillips,* 172 S.W.2d 806 (Tenn. 1943); *Hall v. Payne,* 52 S.E.2d 76 (Va.1949). *See Annot.,* 36 A.L.R.2d 1290 (1954); Sales, *Dual Control Aircraft Accidents,* 42 Ins. Coun. J. 582 (1975); Note, *Res Ipsa Loquitur in Small Aircraft Litigation,* 41 J. Air L. and Com. 103 (1975).

In our review of the decided cases, we perceive two extreme positions. On the one hand, there is a line of authority which demonstrates for all practical purposes a judicial unwillingness to submit the issue of pilot identity to a jury based upon circumstantial evidence. *See, e.g., Udseth v. United States, supra; Morrison v. LeTourneau Company of Georgia,* 138 F. 2d 339 (5th Cir. 1943); *In Re Hayden's Estate, supra; Michigan Aero Club v. Shelley, supra; Mitchell v. Eyre, supra.* The other extreme is the Minnesota rule or the "pilot in command" doctrine, as that term is defined in the Federal Air Regulations,[4] which holds that the pilot in command is responsible for the negligent act, irrespective of whether or not he is in actual operation of the controls at the time of the fatal crash. *Lange v. Nelson-Ryan Flight Service, Inc., supra, cert. denied,* 371 U. S. 953 (1963).[5]

In our judgment the proper approach to this question of pilot identity is the rule which applies generally in civil actions, that is, pilot identity must be proved by the plaintiff by a preponderance of the evidence under the standard that

4. 14 C.F.R. 91.3 provides:

"Responsibility and authority of the pilot in command. (A) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."

5. The Court of Appeals for the 10th Circuit characterized the Lange case as a "minority of one" in Udseth v. United States, *supra,* 530 F. 2d at 861.

the fact sought to be proved is more likely so than not so. This is what we mean by a preponderance of the evidence. *See C. & P. Telephone Co. v. Hicks*, 25 Md. App. 503, 337 A. 2d 744 (1975). This rule is the same whether the evidence bearing upon the question at issue is direct or circumstantial. As the Supreme Court of Nebraska stated in the case of *Mitchell v. Eyre, supra:*

> "To recover herein the plaintiff was required to prove who was piloting the plane at the time of the crash. Until she has done so she has not met her burden of proof. The finding of negligence is immaterial until we can determine the identity of the person to be charged with responsibility for the negligence."

It must be recognized, of course, that in the case of a disaster involving a small private aircraft where all of the several occupants have perished, there can ordinarily be no certainty of pilot identification and, in the generality of cases, the evidence bearing upon that issue will be entirely circumstantial. To withstand a motion for a directed verdict, the plaintiff should be required to produce probative evidence that the individual claimed to be the pilot was the one in charge of the controls at the critical instant of time. Probative evidence is not evidence that invites speculation and when appellants argue, as they do in their brief, that the "majority rule prohibits jury speculation on the identity of the individual piloting a dual control airplane," they are speaking not of a "majority rule" applicable to aviation accidents but of a fundamental precept of law which proscribes jury speculation in any case, civil or criminal.

In the absence of statutory authority, the rules of law governing aviation cases are the same as those governing ordinary negligence actions in Maryland. *State, Use of Piper v. Henson Flying Service, Inc.*, 191 Md. 240, 247, 60 A. 2d 675 (1948). A familiar Maryland rule is that a defendant's negligence may be shown by either direct or circumstantial evidence and may be inferred from all of the facts of the case. *Western Maryland Railroad Co. v. Shivers*, 101 Md. 391, 61 A. 618 (1905); *Pearson v. Wiltrout*, 17 Md. App. 497,

501, 302 A. 2d 678 (1973). (The appellees rely in the instant appeal upon ordinary negligence and not *res ipsa loquitur*.)

Here, the trial court reserved ruling on appellants' motion for a directed verdict and thereafter denied appellants' motion for judgment *n.o.v.* in the face of circumstantial evidence which included the following:

(1) Mr. Todd occupied the left front seat at takeoff, the seat customarily occupied by the pilot;

(2) A male voice which appellants conceded at trial to be that of Mr. Todd was in communication with Air Traffic Control at Dulles Airport only minutes before the fatal accident; [6]

(3) Todd was the president of the company which owned the aircraft and was a licensed pilot with a substantial amount of flying experience;

(4) Mrs. Weikle, while a flying enthusiast, was a student only with limited experience and no known familiarity with instrument flight conditions;

(5) The weather conditions at takeoff and during the flight required, pursuant to FAA Regulations, that the plane be flown under instrument flight rules;

(6) The instruments required to manage the aircraft under adverse weather conditions were located only in front of Mr. Todd's seat;

(7) Mr. Weikle positively identified Mr. Todd as the pilot of the aircraft during takeoff and there is no evidence to disclose whether or not it was feasible for Todd and Mrs. Weikle to exchange seats during flight;

(8) There was no evidence of any sudden illness on the part of Mr. Todd nor of panic on the part of

---

6. Although in their brief, appellants state that the male voice was never positively identified as that of Mr. Todd or Mr. Brooks, during closing argument counsel for the appellants stated: "There is no question that he (Todd) was flying the airplane when it circled here (indicating the area surrounding Martinsburg Airport)." Mr. Brooks was seated in the rear passenger seat and had no experience piloting a plane.

Mrs. Weikle, although the trial court stated to the jury that "the possibility of Mrs. Weikle grabbing the dual controls is an item for you to consider on this question of fair preponderance of the evidence and burden of probabilities."

Circumstances similar to those existing here have been found persuasive by other courts on the issue of the sufficiency of the evidence to require submission of the case to the jury. Thus, in *Insurance Company of North America v. Butte Aero Sales and Service, supra*, the court stated in holding the evidence was sufficient on the issue of pilot identity to support a denial of defendant's motion for a directed verdict:

"Under the circumstances it is impossible for anyone to be absolutely certain as to who was piloting the plane when it crashed, but the court believes there was sufficient evidence for the jury to find that Elderkin was the pilot. *The only evidence that Hodge might have been the pilot was that he could fly and liked to do so, and that the plane had dual controls.* On the other hand, Elderkin was the owner of the plane and had frequently flown it, whereas Hodge had never flown it. At the time of takeoff Elderkin occupied the seat from which a plane is usually and customarily flown, and after the crash Hodge was still strapped in the opposite seat. Elderkin requested permission to take off." 243 F. Supp. at 281. (Emphasis added.)

And in *Drahmann's Administratrix v. Brink's Administratrix, supra*, where a small dual control aircraft crashed during aerial maneuvers, and an eyewitness testified that the plane in its final moments appeared not to be handled by an experienced pilot, the court reversed a directed verdict for the defendant and stated:

"It appears to us that a man like [the plaintiff's decedent], with no flying experience, would not

attempt the difficult and skilled maneuver of bringing a plane in for a landing. [The defendant's decedent] had the skill and experience to make the landing properly. Any man has an instinct for self preservation." 290 S.W.2d at 454.

Again, in *Boise Payette Lumber Co. v. Larsen, supra,* four men were killed in the crash of a small private dual-control airplane. The owner of the plane, one Homer Smith, was a licensed pilot. Another occupant of the plane, plaintiff's decedent, Wayne Larsen, also had experience flying a plane. The crash occurred minutes after a voice identified as Smith's requested clearance to land. The court stated:

"There is little reason to doubt that in the plane Smith did all the talking. But was Smith flying the plane? It is not a mathematical certainty, but the conclusion that he was flying the plane was within jury limits. The jurymen could consider from their human experience whether, when Smith owned the plane, was doing the talking on the radio on the request for clearance, . . . it was probable that he had turned the controls over to another who had not flown for some months." 214 F. 2d at 377.

In affirming a decision in favor of the plaintiffs, the court observed:

"In big, complex airplanes, there is a division of labor, almost everyone knows. But in a small aircraft with the owner aboard, may the jury not assume when the owner was doing the talking to the control tower that the owner had the reins in his hands?" 214 F. 2d at 377.

We also observe that appellees in the instant case are aided by the Maryland rule known as the "presumption of continuance." As described in *Campfield v. Crowther,* 252 Md. 88, 249 A. 2d 168 (1969):

"There is, within certain limits, a presumption of fact that something which has been proved to exist

continues to exist for a reasonable time, depending on what it is and the circumstances of the case. This is known as the presumption of continuance, and it is held to be not a legal presumption, [and, therefore, does not shift the burden of proof, *see Evans v. State*, 28 Md. App. 640, 349 A. 2d 300 (1976), *aff'd*, 278 Md. 187, 362 A. 2d 629 (1976)], but a matter of the burden of proof." 252 Md. at 97, *quoting, Donner v. Calvert Distillers Corp.*, 196 Md. 475, 490, 77 A. 2d 305, 311 (1950).

In *Campfield*, the fact that the defendant was proved to have been driving the car prior to the accident raised the inference that he continued to control the car at the time of the accident. There is little doubt that Mr. Todd was in communication with the Air Traffic Control at Dulles Airport some 8 to 12 minutes prior to the crash, and was at that time in management of the aircraft. *Campfield* held that there was a presumption of fact that the driver's known operation of the vehicle shortly before the accident "continued for a reasonable time." We believe that the time interval involved here between the last communication with the ground and the time of the crash — 8 to 12 minutes later — was a reasonable interval.

We think under the totality of the circumstances, the trial court properly ruled that the question of pilot identity was for the jury to decide.

### III

During the direct testimony of Frederick Michael Fox, investigator for the National Transportation Safety Board, the witness was permitted to state, over objection, that a flight plan for the proposed trip from Beckley, West Virginia to Teterboro, New Jersey was never filed by Mr. Todd.[7]

---

7. Our review of the record reveals that the appellees never read to the jury the FAA regulation, Aeronautics and Space, 14 C.F.R. § 91.115 (a) (1976), which makes mandatory the filing of a flight plan under circumstances where weather conditions require instrument flight. For the purposes of this discussion, however, we will assume that the jury was aware that the failure to file such plan was evidence of negligence.

(Previously, the court had excluded the report itself pursuant to 49 U.S.C. § 1441 (1970)). Although this information was contained in the report of the investigation, it was not shown that it was within the personal knowledge of the witness. Appellants assert that such testimony was hearsay and in contravention of 49 U.S.C. § 1441 (e). The statute reads in part:

> "§ 1441. Accidents involving civil aircraft.
>   (e) Use of records and reports as evidence.
>   No part of any report or reports of the National Transportation Safety Board relating to any accident or the investigation thereof, shall be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

The trial court ruled that, notwithstanding the unequivocal language of the statute, the admission of factual material from a report is not error; only the opinions in the report as to possible causes of the accident, or as to negligence, must be excluded. We think the trial court was correct. From the decided cases, it is established that the above statute is to be narrowly construed. *See Annot.*, 23 A.L.R.2d 1360 (1952).

Faced with a similar issue, the court in *Berguido v. Eastern Air Lines, Inc.*, 317 F. 2d 628 (3d. Cir. 1963) stated:

> "This argument [that the statute precluded certain factual testimony by an investigator] blurs the essential policy and reason behind the section with other policies affecting the admissibility of evidence. The fundamental policy underlying 1441 (e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank disclosure as to the probable cause and thus help prevent accidents and the countervailing policy of making available all accident information to litigants in a civil suit. *Accordingly, the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the*

*accident."* *Id.* at 631-632. *Accord, American Airlines, Inc. v. United States,* 418 F. 2d 180, 196 (5th Cir. 1969). (Emphasis added.)

As the court determined that the challenged testimony involved only factual matters and did not contain any opinions or conclusions, the testimony was deemed admissible.

We agree with the conclusion of the court below that the testimony of Mr. Fox, that Mr. Todd did not file an instrument flight plan, concerned only a matter of fact and did not represent a conclusion or opinion of the agency. The fact that 1441 (e) does not bar its admission is not, however, dispositive of the issue. Since Mr. Fox did not have firsthand knowledge of the fact to which he testified, the testimony was vulnerable to appellants' claim of hearsay. However, we note that Maryland's statutory business records exception establishes the admissibility of Mr. Fox's testimony. Md. Code, Cts. & Jud. Proc., § 10-101 (1974). Appellees properly laid the foundation to classify the investigator's report as a "business record" within the meaning of the statute. The statute provides in part:

> "§ 10-101 Written record.
>     (d) Lack of knowledge of maker. — The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility."

The trial court properly found the testimony to be admissible.

## IV

Appellants argue that the court erred in failing to instruct the jury, as requested, that Mr. Todd "is presumed to have exercised ordinary care for his own safety, in accordance with the natural instinct of human beings to guard against

danger." The court did instruct that any such presumption was "not too applicable," stating:

"Now the law says that where death occurs there is a presumption that a person who died exercised due care, reasonable care. That is not too applicable here because in this case both persons died — Mr. Todd and Mrs. Weikle. Now those so-called [presumptions] are a Mexican stand off. You have got to look at the facts and circumstances to determine all of these items."

We think logic clearly supports the court's instruction where, as here, both principals involved were deceased and the court made plain the burden of the plaintiffs to establish their contentions by a preponderance of the evidence.

Beyond this, it is apparent that appellants seek to invoke the "presumption of due care" on behalf of an individual (Todd) in the posture of a defendant and on the issue of primary negligence. As Judge Moylan stated for this Court in *Young v. Dietzel*, 13 Md. App. 159, 163, 282 A. 2d 150, 153 (1971), in the face of a similar attempt, "In this, [appellants] may not prevail." Appellants would have us abandon our position in *Young v. Dietzel*, placing reliance upon the decision of the Court of Appeals for the Fourth Circuit in *Kapral v. Hartzelius*, 392 F. 2d 548 (4th Cir. 1968). The decision in the latter case, set forth in a brief per curiam opinion, states in part:

"[W]e find no reason or authority to say that it [an instruction concerning the presumption] must be given in regard to a plaintiff's decedent and not in regard to a defendant's decedent, or that it is applicable only to an issue of contributory negligence and not to an issue of primary negligence." 392 F. 2d at 549.

For the reasons amply considered and well-stated in *Young v. Dietzel, supra,* the presumption *is* limited to situations involving plaintiffs, on the issue of contributory negligence, in the absence of countervailing evidence. *See Bratton v.*

*Smith,* 256 Md. 695, 261 A. 2d 777 (1970); W. Prosser, *Law of Torts* 416 (4th ed. 1971). As Judge Moylan expressed it in *Young v. Dietzel:*

> "The logic of the proposition that the presumption of due care applies only on the issue of contributory negligence speaks for itself. 'Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of conduct to another person. Contributory negligence involves no duty. . . .' Prosser, *supra,* at 418. Since the presumption of due care is predicated upon 'the instinct of self-preservation' and 'has for its motive the fear of pain or death', it is highly relevant to the issue of contributory negligence, which involves the actor's protection of himself, but has no relevance to the question of primary negligence, which involves a duty to others." 13 Md. App. at 165-66.

We find no error in the trial court's instruction and in its refusal to grant appellants' requested instruction.

## V

The final question presented on this appeal is whether the Wrongful Death statute of Maryland, as it existed at the time of the fatal accident in 1971, permitted Kevin, the minor child of Antha Weikle, to recover not only pecuniary damages but also solatium.

The trial court, although candidly uncertain of the child's entitlement to solatium, submitted that question to the jury which returned a verdict in the sum of $40,000 for the child's mental and emotional pain and suffering, etc., as well as $25,000 in pecuniary damages. We note that in a chambers conference with counsel, prior to instructing the jury, the court observed that to withhold from the jury the question of solatium would, in the event of error, necessitate a new trial; whereas, if this Court on appeal, after an award of

solatium, determined that the statute did not authorize such an award, a new trial could be avoided by striking that portion of the judgment. This impresses us as a commendable exercise of judicial discretion. As previously indicated, we do conclude that the language of the statute in effect in 1971 precluded an award of solatium.

Before proceeding to a discussion of the basis for our determination, we observe that the General Assembly of Maryland amended the Wrongful Death statute (now Cts. & Jud. Proc., § 3-904 (d) (1974), recodifying Code, Art. 67, § 4 (b) (1957, 1970 Repl. Vol.) by ch. 120, Acts of 1975, effective July 1, 1975) in such manner as to provide specifically for the recovery of solatium upon the death of a parent of a minor child. The legislature thus removed from the statute, as it previously existed, the question of interpretation which gave rise, in part, to this appeal. It was specifically provided, however, that the amendment "shall be construed only prospectively and shall not be applied or interpreted to have any effect upon or application to any event or happening occurring prior to the effective date of this act."

At the time of Mrs. Weikle's death, in September 1971, the Maryland Wrongful Death statute, Code, Art. 67, § 4 (1970 Repl. Vol.) provided as follows in subsection (a):

> "(a) Every such action shall be for the benefit of the wife, husband, parent and child of the person whose death shall have been so caused or if there be no such person or persons entitled then any person related to the deceased by blood or marriage, who, as a matter of fact, was wholly dependent upon the person whose death shall have been so caused. . . . [A]nd in every such action the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought, and the amount so recovered, after deducting the costs not recovered from the defendant, shall be divided amongst the above-mentioned parties, in such shares as the jury by their verdict shall find and direct; provided, that

no more than one action shall lie for and in respect of the same subject matter of complaint; and that every such action shall be commenced within two years after the death of the deceased person."

Subsection (b) was enacted by the General Assembly by ch. 352, Acts of 1969, to change the Maryland rule which limited the measure of damages in wrongful death cases to "pecuniary loss." [8] It contained the following language:

"(b) *In the case of the death of a spouse or a minor child,* the damages awarded by a jury in such cases shall not be limited or restricted to the 'pecuniary loss' or 'pecuniary benefit' rule, but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, *parental care,* filial care, attention, advise, counsel, training, guidance, or education where applicable." (Emphasis added.)

Here, the appellants contend that because this is not a case involving the death of a minor child, a minor child who survives the death of a parent may not recover for mental anguish and the other elements included in the concept, solatium. In the proceedings below and in this Court, appellants find support for their position in *Wittel v. Baker,* 10 Md. App. 531, 272 A. 2d 57 (1970) and *Cincotta v. United States,* 362 F. Supp. 386 (D. Md. 1973). The interpretation of the statute for which appellants argue is that where a spouse who is also the mother of a minor child is negligently killed, only her surviving spouse and not her minor child may recover solatium. This was the interpretation adopted by the Court in *Cincotta, supra,* and in the subsequent case of *Alden v. Maryanov,* 406 F. Supp. 547 (D. Md. 1976), Chief Judge Northrop speaking for the court in both cases. In each

8. As recently as January 1969, in Hutzell v. Boyer, 252 Md. 227, 249 A. 2d 449 (1969), and in numerous prior cases, the Court of Appeals consistently held that the measure of recovery for wrongful death was the "present value of the pecuniary benefit which the [survivors] might reasonably have expected to receive from [a deceased] if he had not been killed." *Id.* at 237, *quoting,* United States v. Guyer, 218 F. 2d 266, 268 (4th Cir. 1954).

instance, the United States District Court relied upon our decision in *Wittel.*

The legislative history of ch. 352, Acts of 1969, with which we are here concerned, was traced by Chief Judge Orth speaking for this Court in *Wittel.* The bill as originally introduced would have been applicable to every death action because it read: "In every such action, including the death of a minor child. . . ." It was amended, however, before passage to read: "In the case of the death of a spouse or a minor child, . . . ." We therefore concluded that despite the pronouncements in the preamble to ch. 352, Acts of 1969, quoted *in extenso,* 10 Md. App. at 535, it was "patent" that the General Assembly *"did not feel that the pecuniary loss rule was utterly wrong, for it superseded the rule only in the case of the death of a spouse or a minor child."* 10 Md. App. at 536 (Emphasis added.) We recognize that the above statements are essentially dicta but we are persuaded that the analysis is sound.[9]

We find troublesome, of course, the fact that the legislature, although amending the bill after its introduction in the manner described, retained in the body of the act the words "parental care" in its enumeration of the various elements for which compensation might be awarded as solatium. These words were also noted when Art. 67, § 4 was recodified in 1973 as Cts. & Jud. Proc. § 3-904 (d). The language of subsection (b) was the subject of comment but was not altered. The Revisor's Note explained:

> "The staff is aware that the proposed draft perpetuates what appears to be a defect in the existing statute. Section 4 (b) of Article 67 applies only to the case of the death of a spouse or minor child. The death of a parent, especially a widow, widower, or divorced parent, who could not be called a spouse, is not in terms covered by the subsection, although one of the elements of damage

---

**9.** In the later case of Barrett v. Charlson, 18 Md. App. 80, 97, 305 A. 2d 166 (1973), Judge Scanlan writing for the court, we adhered to the interpretation of Wittel that the legislature limited the statute to minor children and spouses only.

is stated to be 'parental care'; and the statute also refers to counsel, training, guidance, etc., which are more applicable to the death of a parent than to anything else.

"However the commission is cognizant of the fact that this law was adopted in its present form by ch. 352, Acts of 1969, and after a previous effort to broaden the language was made unsuccessfully in 1968. The present language is of recent vintage and apparently the result of legislative compromise. Thus, despite any logical defects it may contain, the commission believes that change is a matter for the legislature."

While it is arguable, as the lower court stated, that the legislative intent as gathered from the preamble and retention of the words "parental care" was to permit a minor child to recover solatium, the opening language of subsection (b) clearly limits its provisions to "the case of the death of a spouse or a minor child" and it is not the function of an appellate court to rewrite a statutory provision. As Judge Orth wrote in *Wittel*, "Any change that may be deemed advisable must come, we feel, from legislative enactment. And some change has so come." 10 Md. App. at 536. Indeed, since the date of *Wittel*, complete change has come but the legislature ordained that it be prospective only in its application.

Under these circumstances, we are compelled to hold that the trial court erred in permitting the jury to consider the mental anguish and suffering of the minor child, Kevin Weikle, in awarding damages. However, we reject appellants' contention that by submitting the issue of solatium for the minor child to the jury, the entire verdict was tainted because of the admission of testimony, during trial, of the child's mental anguish and grief. The trial court, anticipating appellate review of his decision, submitted separately to the jury the issues of damages. Thus, the jury was asked:

"In what amount do you assess the damages of Kevin Dale Weikle for such mental anguish,

emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, counsel, training, or guidance, if any, of the infant plaintiff, Kevin Dale Weikle, for the life expectancy of his mother?"

By segregating solatium from the element of pecuniary loss, the trial court assured that the jury's award of pecuniary damages would not be affected by the testimony concerning the minor child's mental anguish. We also note that the trial court instructed the jury that:

"Your verdict shall not be influenced merely because Mrs. Weikle has died and you have a great deal of sympathy for her survivors. Your verdict should not be influenced by malice or prejudice or sympathy or anything else. Everybody is entitled to equal treatment before the law and you judge this thing on legal principles and not on the basis of sympathy."

We vacate the award of $40,000 damages to Kevin Dale Weikle. The award to him of $25,000 for pecuniary loss is undisturbed.

> *Judgment in favor of Marshall E. Weikle in the amount of $170,000 affirmed; judgment in favor of Kevin Dale Weikle in the amount of $25,000 affirmed; judgment in favor of Kevin Dale Weikle in the amount of $40,000 reversed; costs to be equally divided.*