INDIANA STATE HIGHWAY COMMIS-
SION, Appellant (Defendant Below),

State of Indiana, Aeronautics Commis-
sion of Indiana (Defendants Below)

v.

Roger M. RICKERT, as Administrator of
the Estate of Charles D. McDaniel, De-
ceased, Appellee (Plaintiff Below).

No. 3–1078A255.

Court of Appeals of Indiana,
Third District.

Nov. 13, 1980.

Rehearing Denied Jan. 23, 1981.

Theodore L. Sendak, Atty. Gen., Thomas R. Hamill, Deputy Atty. Gen., Indianapolis, for appellant.

Sherrill Wm. Colvin, John O. Feighner, Snouffer, Haller & Colvin, Fort Wayne, for appellee.

HOFFMAN, Judge.

This was an action for negligence arising out of the fatal crash of a private airplane in which decedent, Charles D. McDaniel, was an occupant. The jury returned a general verdict against defendant–appellant Indiana State Highway Commission (Commission) and awarded plaintiff–appellee Roger M. Rickert, as administrator of McDaniel's estate, $300,000 in damages.[1]

To orient the reader to the circumstances of the crash it is necessary to explain the physical layout of the area. Hap's Airport had been in existence since about 1953. The airstrip had a runway 2,200 feet in length which ran in a north–south direction. It was 22 feet wide. The southern edge of the runway was located 180 feet from an overpass which ran in a east–west direction. The overpass, part of Potter's Road, had been constructed by the Commission in 1959. It extended 16 feet higher than the elevation of the runway. The apex of the overpass was directly in line with the approach path to the runway.

Around 2:30 P.M. on June 27, 1975 George Keefe and McDaniel were occupants in a small airplane which was approaching Hap's Airport from a southerly direction for a landing. The angle of the approach was normal and customary. The crash occurred when the aircraft collided with a cement truck which was crossing the overpass at a point where the truck was in direct line with the runway. Upon impact the plane nosed down and crashed in a parking lot wedged between the slope wall of the overpass and the runway. Both men were killed.

The Commission raises these issues for review:

(1) whether IC 1971, 8–21–7–1 et seq. (Burns Code Ed.) applied to the Commission;

(2) whether application of IC 1971, 8–21–7–1 et seq. to the Commission contravenes Art. 4, § 22 of the Indiana Constitution;

(3) whether the permit system imposed by IC 1971, 8–21–7–3 infringes upon the Commission's power of eminent domain;

(4) whether the Commission owed any duty to McDaniel;

(5) whether the Commission's alleged breach of duty was the proximate cause of McDaniel's death;

(6) whether the Commission is shielded from liability by virtue of the statutory immunity provision of the Indiana Tort Claims Act;

(7) whether the trial court erred in refusing to give certain · instructions tendered by the Commission;

(8) whether error was committed in admitting photographs portraying the accident scene; and

(9) whether the jury reached an inconsistent verdict.

In his cross–appeal plaintiff submits that he should have been awarded 8% interest on the judgment.

Initially the Commission contends that the verdict is contrary to law because no duty was owed to McDaniel. In response plaintiff maintains that the Commission was under both a statutory and common–law duty to design and construct the overpass in a safe manner.

---

1. The jury also found in favor of defendants State of Indiana and Aeronautics Commission.

The other defendants charged in the complaint settled prior to trial.

To support his statutory duty theory plaintiff relies upon IC 1971, 8–21–7–3[2] which reads in pertinent part as follows:

"Until a permit therefor has been issued by the commission *no person shall erect*, add to the height of or replace *any structure*, unless such replacement only involves the repair, maintenance or restoration of an existing structure:

(a) within an area lying one thousand five hundred [1,500] feet on either side of the extended center line of a runway or landing strip for a distance of two [2] miles from the nearest boundary of any public use airport which will result in a structure extending to a height of more than one hundred fifty [150] feet above the level of such runway or landing strip; *nor, within that portion of such area that is within a distance of three thousand [3,000] feet from such nearest boundary, that will result in a structure extending higher than a height above the level of such runway or landing strip determined by the ratio of one [1] foot vertically to every twenty [20] feet horizontally measured from such nearest boundary*;

(b) at any other place within this state which will result in a structure extending more than five hundred [500] feet above the highest point of land within a one [1] mile radius from such structure." [Emphasis added]

Basically this statute provides that unless a permit has been issued by the Aeronautics Commission no structure can be erected within the inner area approach zone to any runway for a distance extending 3,000 feet from the end of the runway to any height which would interfere with the glide angle therefrom of 20 feet horizontally to each one foot of vertical height. Under this provision the permitted elevation of structures at the location of the overpass was approximately 9 feet since the nearest end of the runway was 180 feet from the overpass. In spite of this proscription the Commission constructed the overpass at an elevation of 16 feet thus projecting itself into the prohibited area about 7 feet. Not having obtained a permit the Commission clearly violated the act.

■ It is suggested, however, that IC 1971, 8–21–7–1 *et seq.* did not give rise to a duty on the part of the Commission because those provisions only apply to "persons," a term whose statutory definition allegedly excludes the State and its agencies. IC 1971, 8–21–7–2 defines "persons" to include "individuals, trustees, receivers, partnerships, associations, corporations for profit and not for profit, religious corporations, municipal corporations and *bodies politic*." (Emphasis added). The Commission advances a convoluted argument, the gist of which is that only the phrase "bodies politic and corporate" encompasses state agencies. It insists that the term "bodies politic" merely refers to counties.

A review of the cases cited by the Commission as well as decisions gleaned from other jurisdictions refutes this position. In *Ervin et al. v. State, ex rel. Walley* (1897), 150 Ind. 332, 48 N.E. 249, one of the issues raised was whether the State was a person within a statute permitting an executor, administrator, a trustee of an express trust or a person expressly authorized by statute to sue without joining the person for whose benefit the action was prosecuted. The court noted:

"Among the rules for the construction of the code, it is provided in section 1309, Burns' R. S. 1894 (1285, R. S. 1881), that: 'The word "person" extends to bodies politic and corporate.' Webster defines the words 'body politic' to be 'The collective body of a nation or state as politically organized, or as exercising political functions; also a corporation.'

"Therefore, we hold that the code does not require the action to be brought in the name of the real party in interest, where, as here, a person, the State, is expressly authorized by statute to sue without joining the person for whose benefit the action is prosecuted."

150 Ind. at 337, 48 N.E. 249.

---

**2.** This act was amended in certain immaterial ways by Acts 1979, P.L. 101, § 1.

Thus, the court there held that the words "body politic" refer to the State. *In re Burk* (1918), 66 Ind.App. 435, at 439–440, 118 N.E. 540 reached a similar result.

"We proceed to the second question: Every action must be prosecuted in the name of the real party in interest, subject to certain exceptions, among them, that a person expressly authorized by statute may sue without joining with him the person for whose benefit the action is prosecuted. §§ 251, 252 Burns 1914, §§ 251, 252 R.S. 1881. The real party in interest is the party entitled to receive the benefits of the suit. *Franklin Ins. Co. v. Wolff* (1899), 23 Ind.App. 549, 54 N.E. 772. The word 'person' as used in the foregoing statutes 'extends to bodies politic and corporate' (§ 1356 Burns 1914, § 1285 R.S. 1881), which term includes the state, *Erwin [sic] v. State, ex rel.* (1897), 150 Ind. 332, 48 N.E. 249. If the provisions of §§ 252 and 1356, to which we have referred, be construed together, it results that a natural person or a body politic or corporate, although not the real party in interest, if expressly authorized by statute, may sue without joining the person for whose benefit the action is prosecuted. Ordinarily the term 'body politic and corporate' includes only corporations, private, public and governmental. 8 C. J. 1136, 1137. Such an organization as the Industrial Board of Indiana is an agency of state government, rather than a body politic or corporate. 1 Thompson, Corporations § 21."

This case held that the Industrial Board, as an agency of the State, was not a "body politic and *corporate*." (Emphasis added). Similarly, the Commission is an agency of the State. In light of *Burk* it cannot be said to be a body politic and corporate. The last case cited by the Commission on this point is *Uricich v. Kolesar* (1936) 132 Ohio St. 115, 5 N.E.2d 335 but it is not controlling either. This decision merely held that the term "bodily politic" includes a county. In no way can the holding be construed to pertain only to counties.

In determining whether the Open Meeting Law applied to meetings of a law school faculty, the North Carolina Supreme Court in *Student Bar Ass'n Bd. of Governors, etc. v. Byrd* (1977) 293 N.C. 594, 239 S.E.2d 415 presented a comprehensive analysis of the term "body politic" and that discussion seems germane to the issue at bar.

"Webster's New International Dictionary, 2nd Edition, defines 'body politic' as 'a group organized for government; now usually specif.: a. a state .... b. an organized society, as in a church.' In Ballentine's Law Dictionary, the term 'body politic' is thus defined: 'The term is aptly defined in the preamble of the state constitution of Massachusetts as a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This definition was quoted with approval by the Supreme Court of the United States in *Munn v. Illinois*, 94 U.S. 113, 124, 24 L.Ed. 77, 84 (1876), and by this Court in *Durham v. Cotton Mills*, 141 N.C. 615, 642, 54 S.E. 453 (1906). Ballentine's Law Dictionary defines the related term 'body politic and corporate' as 'A term often applied to a municipal corporation' and says, 'A county is such a body.' In 11 C.J.S. Body p. 380, the term 'body politic' is interpreted as follows:

'A term of ancient origin, the collective body of a nation or state as politically organized, or as exercising political functions; the state or nation as an organized political body of people collectively; a corporation, a body to take in succession, framed as to its capacity by policy. It has been said that the phrase connotes simply a group or body or [sic] citizens organized for the purpose of exercising governmental functions; that such a group may be large or small, and that it may be a group within a group, including counties even though they are but agencies of the state. It may be formed by a voluntary association of individuals, and is a social compact by which the whole people covenants with each citizen and each citizen with the whole people that

all shall be governed by certain laws for the common good. Where the term is used as referring to the state, it signifies the state in its sovereign, corporate capacity, and applies to a body incorporated by the state and charged with the performance of a public duty, such as an institution of learning for the benefit of the people of a particular parish, or a corporate body created for the sole purpose of performing one or more municipal functions, or an incorporated board of trustees of a levee district, or a township declared by statute to be a body politic and incorporate. Also, it applies to the United States as a body capable of attaining.the objects for which it was created, by the means which are necessary for their attainment.' "

239 S.E.2d at 419–420. *Cf.: State ex rel. Wis., etc. v. Wis. Dept. of Ind.* (1975) 68 Wis.2d 677, 229 N.W.2d 591 (state is a body politic but it is not corporate nor are state agencies corporate).

■ The charge is also made that application of the High Structures Safety Act to the Commission would contravene Art. 4, § 22 of the Indiana Constitution. That provision reads as follows:

"The General Assembly shall not pass local or special laws, in any of the following enumerated cases, that is to say: ...

(7) For laying out, opening and working on highways, and for the election or appointment of supervisors; ..."

■ A law will not be deemed local and special if it applies to all who come within its provisions generally and without exception, rests upon an inherent and substantial basis of classification and its operation is the same in all parts of the state under the same circumstances and conditions. *Saraceno v. State* (1931), 202 Ind. 663, 177 N.E. 436. In determining whether or not a legislative classification is reasonable or local or special and therefore violative of the Constitution, every reasonable presumption must be indulged in favor of the constitutionality of a statute. *Tinder, Pros. Atty., et al. v. Music Op., Inc.* (1957), 237 Ind. 33, 142 N.E.2d 610.

The Commission posits that imposition of a permit system would constitute legislative interference with the laying out, opening and working on highways. Aside from this solitary remark it has offered no reasons why the act is unconstitutional. The Commission has not identified the classifications created by the act nor has it shown that the statute operates in a manifestly arbitrary manner. Accordingly, the Commission has failed to meet its burden of overcoming the presumption of constitutionality.

■ The permit system is also attacked on the grounds that it would infringe on the Commission's power of eminent domain insofar as the ability to condemn land near airports for the location of highways would depend on whether or not a permit could be obtained from the Aeronautics Commission. A similar question arose in *Indianapolis Power & Light Co. v. Barnard* (1978), Ind. App., 371 N.E.2d 408. There it was held that an electric utility which sought to condemn a right–of–way across land for the purpose of placing towers and transmission lines and which had applied for a permit as prescribed by the High Structures Safety Act need not wait until it was granted the permit before exercising its power of eminent domain. Therefore it must be concluded that the Commission does not need a permit from the Aeronautics Commission before it can acquire land through eminent domain proceedings.

In connection with its challenge to the permit scheme the Commission cites *Indiana Toll Rd. Comm. v. Jankovich et al.* (1963), 244 Ind. 574, 193 N.E.2d 237. From its perspective

"The ruling in the *Jankovitch* [sic] case indicates that the power to build elevated roads to bridges near airports cannot be limited by the imposition of a condition precedent, in the attainment of the permit or a variance. The holding implies that the Indiana State Highway Commission can build an elevated road near an airport whether or not it obtains a permit. The holding further supports the Indiana State Highway Commission's po-

sition that it should not be construed as being within the scope of the term 'bodies politic' as used in IC 8–21–7–2, *supra*." That case is inapposite. There operators of an airport brought an action for damages allegedly sustained from the construction of a toll road in violation of a zoning ordinance regulating the height of structures within a certain area of the airport. At trial the operators prevailed but the Indiana Supreme Court reversed, holding that the ordinance purported to authorize an unlawful and unconstitutional appropriation of property rights without payment of compensation. Nothing in *Jankovich* even remotely bears on the issues raised by this appeal.

■ The Commission further denies liability on the grounds that a "vendor of land, who has created a condition upon the land, remains liable to third parties only until the third party has had a reasonable opportunity to discover the condition and take precautions." The motion to correct errors filed by the Commission did not alert the trial court to this issue so it is waived. *Indiana Motorcycle Ass'n v. Hudson* (1980), Ind.App., 399 N.E.2d 775. Moreover, there was no evidence to sustain its application.

■ The next prong of the Commission's no–duty claim is that Potter's Road had been abandoned. To underscore this allegation attention is drawn to a resolution adopted by the Commission in which it relinquished the disputed portions of the road to Clark County. Unfortunately for the Commission this exhibit, while attached to its motion for summary judgment, was not admitted at trial and any error in its exclusion has not been pressed on appeal. To the extent that the Commission's reliance on the resolution implies that documents, which are a part of a motion for summary judgment but are not introduced at trial, may be used to overturn a verdict its reliance is misplaced. This precise point was dealt with in *Logan v. 3750 North Lake Shore Drive, Inc.* (1974), 17 Ill.App.3d 584, 308 N.E.2d 278, at 282:

"In the case before us the only evidence introduced concerning the reasonableness of the Board's action was the minutes of the special meeting of the Board of Directors dated April 29, 1969. That exhibit clearly states that plaintiff's application was refused without a consideration of the proposed sublessee's qualifications but on the ground that it was the long-established policy of the building to deny such requests. Defendant argues on appeal that one of the significant needs and purposes of the cooperative arrangement is the need to maintain and perpetuate a high degree of permanency and stability in the occupancy of apartments. This may be so; however, defendant wishes us to consider on appeal matters relevant to needs and purposes which may have compelled the Board to refuse plaintiff's application as evidence. No evidence was presented by defendant at the trial and the trial court could not–as we may not–consider documents which were a part of the summary judgment proceeding and were never offered or received as evidence at the trial. *Estate of Enoch* (1964), 52 Ill.App.2d 39, 50, 201 N.E.2d 682."

■ Assuming that the resolution had been introduced at trial it still would not have absolved the Commission from responsibility as a matter of law for the negligent design and construction of the overpass. As was noted in *State v. Dwenger* (1976), Ind.App., 341 N.E.2d 776, at 778–779,

"The State's argument that maintenance of the walkway area was not its responsibility but that of the City of Indianapolis is, in effect, an argument that Dwenger's injury was the proximate result of the City's intervening negligent maintenance and not of the State's original negligent design and construction. Without deciding whose was the duty to maintain the area in question we reject that argument.

\*      \*      \*      \*      \*      \*

"In the instant case the failure of the City to maintain the footbridge, assuming the City had such a duty, 'was not an intervening cause that interrupted or turned aside the natural sequence of events' resulting from the negligent design and construction of the footbridge."

To reiterate what has been said before the object of the High Structures Safety Act is to provide for the safety of the public.

> "The safety, welfare and protection of persons and property in the air and on the ground and of the maintenance of electronic communication within this state requires that the navigable airspace overlying the state and the approaches to and the air traffic pattern area of any public use airport in this state be maintained in a reasonably unobstructed condition for the safe flight of aircraft. To that end, the location and height of structures and the use of land thereto related, is regulated."

IC 1971, 8–21–7–1.

The general rule is that violation of a statute enacted for reasons of safety is negligence per se. *Northern Ind. Transit, Inc. v. Burk* (1950), 228 Ind. 162, 89 N.E.2d 905. Stated differently, the function of a prohibitory statute in negligence cases is the establishment of a duty, the violation of which constitutes the negligence. *Elder v. Fisher* (1966), 247 Ind. 598, 217 N.E.2d 847. Undeniably McDaniel as a member of the flying public belonged to the class that the law was designed to protect. Therefore, the Commission owed him a duty.

The Commission also urges that its duty was terminated when it paid an inverse condemnation judgment to Happel. At trial the Commission sought to introduce certified copies of this judgment but the trial court ruled otherwise. Other than a few isolated comments scattered throughout its brief the Commission has not explained why this ruling was error. For this reason any purported error in the exclusion is waived. Consequently, there is a complete lack of evidence to substantiate the assertion that the Commission's duty was satisfied by payment of the condemnation judgment.

But even if exclusion of the copies of the judgment had been preserved for purposes of review such argument would have been unavailing. In *VanNatta v. Crites* (1978), Ind.App., 381 N.E.2d 532, VanNatta maintained that evidence of a prior judgment was not admissible because he was not a party thereto. In addressing this contention the court opined:

> "VanNatta disregards the two sentences which follow the statement on which he relies in *Lasher v. Gerlach, supra,* at 107 Ind.App. 572, 579, 23 N.E.2d 296, 299:
>
> > '... A judgment is always evidence of the fact that such a judgment has been given, and of the legal consequences which result from that fact. This is true, whether the person against whom it was offered as evidence was a party to the action in which it was rendered or not....'"

> "In the case at bar, Crites did not introduce the copy of the prior judgment as evidence of the validity of the lien which Boyd Fox inscribed upon the certificate of title of Maxford Fox. The copy of the judgment only proved that the Monroe Superior Court II had ordered a $1,000 lien endorsed upon Rexall Crites' certificate of title. The copy of the judgment was competent evidence for this purpose even though VanNatta was not a party to the action in which that judgment was rendered. *Lasher v. Gerlach, supra.* The trial court did not err."

381 N.E.2d at 536.

Unlike the situation in *VanNatta* the Commission here sought to introduce copies of the judgment not as evidence of its rendition and the legal consequences thereof but rather to prove a fact upon the supposed existence of which the prior judgment was secured, i.e., that the Commission had purchased sufficient airspace so that the High Structures Safety Act would no longer be violated. The copies were inadmissible for this purpose insofar as plaintiff was not a party or in privity with a party to that suit.

Closely related to this discussion is whether the Commission proximately caused McDaniel's death. The Commission maintains that it should be absolved of legal responsibility because Happel's continued use of the airspace after payment of the condemnation judgment was not fore-

seeable. As indicated certified copies of this judgment were properly excluded. Due to a lack of evidence therein this assertion is without merit.

■ That the Commission knew the overpass violated the High Structures Safety Act can be seen from the following portions of a memorandum contained in the files of the Aeronautics Commission.

"... Mr. Walter Frick of the Indiana Highway Department came to this office on June 15, 1959, and inquired about the possibility of the state acquiring, by purchase, a portion of Mr. Happel's property which includes a segment of the only existing runway. The state has located and constructed a bridge and connecting roadway approximately 75 feet from the edge of the southern boundary of the subject airport. The center line of the runway intersects the highway project at a point within which would violate the provisions of the Tall Structures Act...."

This was sufficient to prove that the violation of the High Structures Safety Act was the proximate cause of McDaniel's death.

The Commission next maintains that it is shielded from liability by virtue of the statutory immunity provision of the Indiana Tort Claims Act. IC 1971, 34–4–16.5–3 (1979 Burns Supp.) enumerates fourteen instances of governmental immunity, the pertinent part of which states:

"A governmental entity ... is not liable if a loss results from: ...

(6) the performance of a discretionary function."

The Commission asserts that the design and construction of highways as well as the decisions whether to sue Happel for the wrongful use of the condemned airspace or whether to apply for a permit with the Aeronautics Commission involve the performance of discretionary acts.

■ With respect to the design and construction portion of the argument the recent case of *Mills v. American Playground Device Co.* (1980), Ind.App., 405 N.E.2d 621 recognized the following rule:

"The discretionary/ministerial distinction hinges on the demarcation between the decision to act and the acts or duties flowing from that decision. *Mobile Enterprises Inc. v. Conrad*, (1978) Ind.App., 380 N.E.2d 100. Mills argue City's decision to establish a park and to equip it is a discretionary function of local government, emanating from which is the ministerial duty to use reasonable care in carrying out that decision. We agree. Once City opted to provide a playground and to equip it, a ministerial duty arose to provide reasonably safe premises."

Likewise, it was within the discretionary function of the Commission as to whether the overpass ought to be built. But once the decision was made to proceed with the project, a duty devolved upon the Commission to exercise reasonable care in the design and construction. *State v. Thompson* (1979), Ind.App., 385 N.E.2d 198; *Indiana State Highway Com'n v. Clark* (1978), Ind. App., 371 N.E.2d 1323.

■ In regards to whether the decisions to sue or apply for a permit are also discretionary functions, these issues are waived for failure to include them in the motion to correct errors or supporting memorandum. *Hogan Tr. and Storage Corp. v. Waymire* (1980), Ind.App., 399 N.E.2d 779.

■ Several assignments of error relate to the refusal of the trial court to give certain instructions tendered by the Commission. Before an instruction is proper there must be sufficient evidence in the record to support that instruction. *Easley et al. v. Williams* (1975), 163 Ind.App. 38, 321 N.E.2d 752.

■ Two of the refused instructions concerned joint enterprise. To establish a joint enterprise there must be evidence of joint control over management and operation of the vehicle and over the course and conduct of the trip. There must also be evidence of community interest of a pecuniary nature in the object and purpose of the undertaking, with equal right to govern movements and the conduct of each other. Finally, there must be an express or implied

contract encompassing all of these elements. *Serna v. Kiger* (1978), Ind.App., 372 N.E.2d 1232; *State, Ind. State Highway Com'n v. Speidel* (1979), Ind.App., 392 N.E.2d 1172.

The evidence seized upon by the Commission to give rise to the badge of joint enterprise focused primarily on the fact that the plane had dual controls and that McDaniel had agreed to fly safety pilot for Keefe. To say that McDaniel had a right to control the plane because of the presence of dual controls would be to employ a pernicious fiction. Obviously, any attempted exercise of the right of control by wresting the wheel from the pilot would be foolhardy.

Keefe was the owner of the aircraft and had invited McDaniel to fly with him. Even if it had been agreed that McDaniel would fly safety pilot so that Keefe could maintain his instrument ratings there was no evidence that McDaniel was acting as safety pilot during the landing. Testimony indicated that simulated instrument flying normally occurs on the enroute portion of the flight. The process involves placing a visor over the head of the pilot so that his vision is restricted to the instrument panel. The safety pilot then acts as his "eyes," warning of oncoming traffic. Thomas Wolfe, airport manager of the Huntington Airport, spoke with McDaniel prior to take-off and he recounted that conversation as follows:

"Q. Do you know what the purpose of their flying together was on June 27, 1975?

"A. As far as I know Mr. McDaniel was going to–I talked with him earlier that day before they went and he said he was going with Mr. Keefe and going to fly safety pilot for them while they were enroute.

"Q. Did you understand that to mean that they were going to be engaged in instrument flying to try to maintain their instrument ratings?

"A. Yes, sir, only in an enroute situation though."

Moreover, there was no evidence of a community interest of a pecuniary nature.

From the testimony of McDaniel's wife it is apparent that the purpose of the flight was social in nature.

"Q. Did you talk to Charles on the day of the accident? [Charles McDaniel]

"A. Yes, I did.

"Q. When did you see him last?

"A. We had lunch together.

"Q. What was the purpose of his going to Hap's Airport?

"A. George Keefe's son was home from college and he wanted his dad to fly down and pick his girl friend up."

■ Thus, evidence of the essential elements necessary to show joint enterprise is not in the record. The instructions tendered by the Commission on this defense were properly refused by the court.

■ Complaint is also made of the refusal of the trial court to give a tendered instruction relating to a federal regulation on simulated instrument flying and an instruction advising the jury that if McDaniel was maintaining a lookout for obstructions then he had a duty to use reasonable care in his observations. As indicated there was no evidence that the two men were engaged in simulated instrument flying during the landing. There was no error here.

■ Error is also claimed in the refusal to give an instruction stating there was no duty on the part of the Commission to warn of a highway condition that was open, obvious or reasonably apparent to a person exercising ordinary care under the circumstances. Again there was no evidence or any legitimate inferences which could be drawn as to McDaniel's actions during the landing. Moreover, the jury was informed that plaintiff could not recover in the event McDaniel was guilty of contributory negligence. This should be sufficient instruction on the subject. No error has been shown.

■ The next question for review is whether the trial court erred in admitting photographs portraying the accident scene which were taken by an investigator of the National Transportation Safety Board.

The Commission urges that the admission of these photographs violated 49 U.S.C.A. § 1903(c) which provides:

"No part of any report of the Board [National Transportation Safety Board] relating to any accident or investigation thereof shall be admitted as evidence or used in any suit or action for damages growing out of any manner mentioned in such report or reports."

This contention already has been decided adversely to the Commission in *Todd v. Weikle* (1977) 36 Md.App. 663, 376 A.2d 104 where a nearly identical statute was reviewed.

"The trial court ruled that, notwithstanding the unequivocal language of the statute, the admission of factual material from a report is not error; only the opinion in the report as to possible causes of the accident, or as to negligence, must be excluded. We think the trial court was correct. From the decided cases, it is established that the above statute is to be narrowly construed. See *Annot.*, 23 A.L. R.2d 1360 (1952).

"Faced with a similar issue, the court in *Berguido v. Eastern Air Lines, Inc.*, 317 F.2d 628 (3d Cir. 1963) stated:

'This argument [that the statute precluded certain factual testimony by an investigator] blurs the essential policy and reason behind the section with other policies affecting the admissibility of evidence. The fundamental policy underlying 1441(e) appears to be a compromise between the interests of those who would adopt a policy of absolute privilege in order to secure full and frank disclosure as to the probable cause and thus held prevent accidents and the countervailing policy of making available all accident information to litigants in a civil suit. *Accordingly, the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident.*' *Id.* at 631–632. Accord, *American Airlines, Inc. v. United States*, 418 F.2d 180, 196 (5th Cir. 1969). [Original emphasis]

"As the court determined that the challenged testimony involved only factual matters and did not contain any opinions or conclusions, the testimony was deemed admissible."
376 A.2d at 111.

Here too the photographs pertained only to factual matters. None of them contained any opinions regarding the probable cause of the accident. There was no error in their admission.

■ Lastly, the Commission contends that the jury reached an inconsistent verdict by finding in favor of the State of Indiana but against the Commission. It should be observed that the Commission did not tender its own verdict form, object to the verdict form given or object to an instruction which allowed the jury to find in favor of the State but against the Commission and vice versa. Under these circumstances the Commission waived any error as to the form of the verdict. *American Optical Co. v. Weidenhamer* (1980), Ind.App., 404 N.E.2d 606.

■ In his cross–appeal plaintiff submits that he is entitled to 8% interest on the judgment in accordance with IC 1971, 34–4–16.5–17. That statute provides:

"A claim or suit settled by, or a judgment rendered against, a governmental entity shall be paid by it not later than one hundred eighty [180] days after settlement or judgment, unless there is an appeal, in which case not later than one hundred eighty [180] days after a final decision is rendered. If payment is not made within one hundred eighty [180] days, the governmental entity is liable for interest from the date of settlement or judgment at an annual rate of eight per cent [8%]."

Plaintiff's interpretation of this statute is that although a governmental entity is not required to pay the judgment until 180 days after a final decision is rendered on appeal, the appeal itself does not relieve the governmental entity of its obligation to pay interest at the legal rate. Under this rationale the Commission is liable for interest

even if it pays the judgment within 180 days of the final decision on appeal. This is an erroneous interpretation of the statute. In *Glick v. Department of Commerce* (1979), Ind.App., 387 N.E.2d 74, at 77, the court addressed this argument and expressed its reasoning as follows:

"Next, Glick asserts that even if the Indiana Tort Claims Act is applicable, he is entitled to recover interest pursuant to the statute because the judgment was not paid within 180 days.

\* \* \* \* \* \*

"Although the trial court rendered judgment in the original action on September 28, 1976, the State appealed the case to the Indiana Court of Appeals. Thereafter, the appeal was exhausted when this court affirmed the trial court's decision on February 13, 1978, since procedures for rehearing and transfer were never instituted.

\* \* \* \* \* \*

"Clearly, there is no need for judicial construction here, where the statute provides that the 180–day period begins to run at the date of settlement or judgment 'unless there is an appeal, in which case not later than one hundred eighty [180] days after a final decision is rendered.'

"The Court of Appeals rendered its judgment on February 13, 1978, and since no petition for rehearing was filed thereon, the Court of Appeals judgment was the 'final decision' from which the 180–day period would run. The State paid the judgment principal plus costs to the Bartholomew County Clerk on April 5, 1978, well within the time period allowed, and therefore was not liable for any interest under the statute." *See also: Speidel v. State* (1979), Ind.App., 386 N.E.2d 180.

No reversible error having been demonstrated the judgment of the trial court is affirmed.

Affirmed.

GARRARD, P. J., concurs.

STATON, J., concurs in result.