622 P.2d 709

**DUKE CITY LUMBER COMPANY,**
Appellant,

v.

**NEW MEXICO ENVIRONMENTAL IM-
PROVEMENT BOARD, Appellee.**

No. 4372.

Court of Appeals of New Mexico.

Nov. 6, 1980.

Rehearing Denied Nov. 17, 1980.

Certiorari Denied Jan. 19, 1981.

John R. Cooney and Susan R. Stockstill, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for appellant.

Jeff Bingaman, Atty. Gen., Bruce S. Garber, Weldon L. Merritt, Asst. Attys. Gen., Santa Fe, for appellee.

OPINION

HERNANDEZ, Judge.

This is an appeal from the action of the Environmental Improvement Board (Board)

denying a variance from an air quality control regulation.

The appellant has operated a sawmill at Espanola, New Mexico, since the early 1960's. At the time the plant has constructed a wigwam incinerator was installed to burn all of the wood waste generated by the operation, approximately 247,000 cubic yards. Beginning in 1966 appellant began to investigate methods of utilizing this woodwaste. Since that time appellant has entered into contracts with various firms for the sale of approximately 93% of this waste. The remaining 7% is incinerated. However, because the incinerator was designed to burn a much larger volume of waste the incineration of the remaining waste results in smoke having an opacity in excess of 20%. In 1975 and again in 1977 and 1978, the appellant and appellee entered into agreements entitled "assurance of discontinuance." The essence of these were that appellant was endeavoring to sell or utilize all·of the woodwaste and in the interim it might be in violation of air quality control regulation 402(A); that appellant would continue to use its best efforts to utilize all of the wood refuse and also seek to minimize the capacity of the omissions.

On February 8, 1979, appellant filed a petition for variance of Air Quality Control Regulation 402(A). A public hearing was held on June 28, 1979. At its meeting of October 12, 1979, the appellee denied appellant's petition citing the following reasons for its decision:

(1) There was a great deal of community objection to emissions from the Espanola facility.

(2) The Board has been very patient with Duke City over the years.

(3) Although Duke City has made strides toward solving the woodwaste problem, the hearing record does not support the variance petition.

(4) The record shows that other alternatives are available.

The pertinent parts of Regulation 402(A) read as follows:

402. Woodwaste Burners [Adopted January 10, 1975] A. After May 1, 1975, except as provided in Subsection A.1, A.2, Section E and Section G, no person owning or operating a woodwaste burner shall permit cause, suffer or allow emissions from the woodwaste burner to equal or exceed an opacity of 20 per cent; and no person owning or operating a woodwaste burner which operates during night time hours shall permit the temperature of the woodwaste burner exhaust gases to be lower than 750 degrees F. during night time hours unless the owner or operator can demonstrate, to the satisfaction of the department, that a lower temperature can achieve an opacity of 20 per cent or better.

We remand for further consideration and proceedings.

There are certain preliminary matters which must be stated in order to view this matter in proper perspective. First, the hearing which developed the evidence upon which the appellee made its decision was quasi-judicial in nature.

"[Q]uasi-judicial is a term applied to administrative boards or officers empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of judicial nature." *Thompson v. Amis*, 493 P.2d 1259, 208 Kan. 658 (1972).

Second, the appellant had the burden of proving its entitlement to a variance.

"[T]he courts have uniformly imposed on administrative agencies the customary common-law rule that the moving party has the burden of proof." *International Min. & C. Corp. v. New Mexico P. S. Com'n*, 81 N.M. 280, 466 P.2d 557 (1970).

However, it should be noted that in judicial and quasi-judicial proceedings:

" 'Burden of Proof' is a term which describes two different concepts, (1) the burden of persuasion, which under the traditional view never shifts from one party to the other, at any stage of the proceedings, and (2) the burden of going forward with the evidence, which may shift back and forth between the parties as the trial progresses." *Ambrose v.*

*Wheatley,* 321 F.Supp. 1220 (D.C.Del. 1971).

It has long been recognized that "proof" is an ambiguous word, and that any "burden of proof" has as its elements a burden of production or going forward and a burden of persuasion. It is said that although a plaintiff always has the burden of persuasion, which never shifts, he may produce sufficient evidence that his opponent's failure to adduce contradictory proof either may lead to a decision for plaintiff, or must lead to such a ruling. *Willingham v. Secretary of Health, Education and Welf.,* 377 F.Supp. 1254 (D.C., S.D.Fla.1974).

■ Once the party who bears the burden of proof has made a prima facie showing the burden of going forward with the evidence shifts to the opposing party. *Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972).

By prima facie showing is meant such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted. *Goodman v. Brock,* supra.

Section 74–2–8(A), N.M.S.A.1978, lists the criteria which must be considered in granting or denying variances:

The board may grant an individual variance from the limitations prescribed under the Air Quality Control Act, any regulation of the board, or any permit condition whenever it is found, upon presentation of adequate proof, that compliance with any part of that act, any regulation of the board, or any permit condition will result in an arbitrary and unreasonable taking of property or will impose an undue economic burden upon any lawful business, occupation or activity, and that the granting of the variance will not result in a condition injurious to health or safety.

Section 74–2–2(B), N.M.S.A.1978:

B. "air pollution" means the emission, except as such emission occurs in nature, into the outdoor atmosphere of one or more air contaminants in such quantities and duration as may with reasonable probability injure human health, animal or plant life, or as may unreasonably interfere with the public welfare, visibility or the reasonable use of property.

Air Quality Control Regulation 401(J)(2):

"opacity" means the degree to which emissions reduce the transmission of light and obscure the view of an object in the background; * * *

Air Quality Control Regulation 100(Z):

"smoke" means small gas-borne particles resulting from incomplete combustion, consisting predominantly, but not exclusively, of carbon, soot and combustible material; * * *

A summary of appellant's evidence is as follows: Appellant's sawmill is located on a 60 acre tract leased from the Pueblo of San Juan. The lease contains this specific provision: "waste materials, including sawdust, shall be burned or otherwise disposed of as they accumulate * * * and unreasonable piles of waste material shall not accumulate on the premises." Appellant employs 94 people at its Espanola plant and the annual payroll is approximately $1,125,000. When constructed, the "wigwam" burner cost in excess of $100,000.00. When the State air pollution standards were enacted appellant spent between $30,000 and $40,000 in modifying this burner to improve its efficiency and cut down on the amount of smoke produced. Since the early 1960's it has been the policy of appellant to try and utilize, as much as possible, of the waste material produced by the plant. Currently appellant is utilizing approximately 97% of the waste materials. In order to do this appellant has entered into several contracts obligating itself to deliver all of the sawdust, green sawdust, wood chips and bark produced by the plant. Appellant's staff engineer studied the cost and problems involved in landfill of wood waste and came to the conclusion that it was a short term expedient with serious long term consequences because of the indefinite and continuous possibility of fire and the difficulty in extinguishing such a fire. Since appellant is presently burning about 75 cubic

yards of waste per day it would take between 10 and 12 truck loads to haul it to a landfill which entails the cost of the trucks and drivers plus the pollution produced by the trucks. Appellant asked the City Manager if it could use the city landfill for disposal of the waste that was not incinerated and was told, that on the advice of Mr. Ray Baca of the Environmental Improvement Division, it could not. Mr. Baca had written the City Manager that they should refuse such a request because of the volume of the waste and because it "may cause a major fire problem." The capacity of a sanitary landfill is between 6,000 and 10,000 cubic yards of debris per acre. At 75 cubic yards of wood waste per day the total would be about 18,000 cubic yards per year which translates into between 2½ and 3 acres of land per year to dispose of it. Appellant's officials testified that even though they were accumulating the wood waste in the incinerator and burning approximately once or twice a week it was not possible to remain within the 20% opacity. The only alternatives were to build several incinerators with varying capacities or to close the mill for several months out of every year or to close it completely, all of which would entail a considerable financial sacrifice.

The principal witness for the Board was Mr. David J. Duran, Program Manager for the Enforcement Section of the Air Quality Control Section of the Environmental Improvement Division. He testified that on a visit to appellant's mill on June 18, 1979, about 80 to 90 percent of the material in the incinerator were slabs which he felt could be utilized, and if the slabs were taken out the remaining refuse would be of such a small quantity that it would be feasible to landfill it. When asked where this could be landfilled, he said, "this could possibly be done within the plant boundaries or possibly taken to the Espanola landfill." It was his opinion that slabs could be taken out after the mill operations had ceased for the day. The largest part of these slabs would have to be cut and after being cut they could be bundled and sold for firewood. All of this assumed a normal functioning of the mill without a breakdown in anyone of the systems. It was also his opinion that incineration should be limited to periods of equipment breakdowns. He said the Environmental Improvement Division had supported the appellant in its efforts towards full utilization of all the wood waste.

On cross-examination he was asked if he had investigated to determine how many men it would take to remove the slabs from the incinerator. His answer was: "Well, again, I don't have the specific information. Again, I believe that burden would be on the company to show why it wouldn't be feasible." When asked if he had any idea how much it would cost in terms of equipment or man hours, he replied: "No, I don't—it doesn't appear that it would take too many people to go through that material * * *." He was asked if he disputed appellant's evidence that there was no room to conduct a landfill operation on the 60 acre mill site, he replied: "I have not investigated that particular aspect in full as far as the facilities available. Perhaps, there are facilities available nearby that could be used." He was also asked if he disputed appellant's evidence that their lease with the Pueblo of San Juan contained a provision that prohibited a landfill operation, his answer was: "Well, I know that that can be renegotiated or at least that it would be approached on that basis." He was then asked: "You don't know whether or not it could? You have not talked to the San Juan Pueblo or the Bureau of Indian Affairs agent about it?" His answer, "No, I have not."

■ Section 74–2–8, supra, provides that if an applicant has shown adequate proof of "arbitrary and unreasonable taking of property" or "undue economic burden," the only reason permitted for refusing such a request would be that the granting of the variance would "result in a condition injurious to [human] health or safety." It is our opinion that appellant made a prima facie showing of undue economic burden. The only evidence controverting that of appellant's on this question was that of Mr. Du-

ran. We have quoted at length from his testimony to show that it consisted almost entirely of surmise and conjecture. "If the factual foundation for an opinion is insufficient it is nothing more than conjecture." *Hegtvedt v. Prybil*, 223 N.W.2d 186 (Iowa 1974). Consequently, this testimony did nothing to rebut appellant's showing of undue economic burden.

This brings us then to the second requirement, that the granting of the variance will not result in a condition injurious to health or safety. The appellant's engineer testified that he knew of no studies showing that wood smoke was injurious to human health. The record shows that there were 7 written complaints received by the Board's Espanola office: (1) "creating tremendous amount of smoke which threatens my health"; (2) "I feel this pollution is unnecessary. Scrap wood could be sold to the poor people in this area also particle board could be made instead of polluting"; (3) "too much pollution in the Valley"; (4) "Too much smoke, it's hurting the air we all breath"; (5) "smoking hazards to my health"; (6) "Too much smoke"; and (7) "Too much smoke." Mr. Ray Baca, the supervisor and environmentalist for the Espanola office, testified that he had received other complaints but had not written them down. Mrs. Jeanne C. Olby, Chairman of the Espanola Chapter of New Mexico Citizens for Clean Air and Water, wrote to the Board, in part, as follows: "the emissions from Duke City's woodwaste burners have caused the people living in the vicinity to suffer poor visibility conditions, inconvenience (laundry cannot be hung on outside lines as it becomes covered with wood ash) and discomfort." Ms. Jean Browman, Acting Chairman of the Los Alamos Chapter of New Mexico Citizens for Clean Air and Water wrote to the Board, in part, as follows: "From our inception [1969], air pollution from woodwaste burners in the Rio Grande Valley has been a problem of continuing concern to the members of the Los Alamos Chapter. This pollution is often especially apparent in the morning when it hangs in the air in thick layers or bands after night long emissions in the still night air with little mixing. The woodwaste pollution is one of the two or three continuing problems most often complained of by our members to Chapter Officials and it is one of the specific problems most often mentioned as a reason for joining the Chapter." As can be seen, these were lay opinions without authoritative support of any kind.

"The general rule is 'that witnesses must testify to facts, and not to opinions, and that whenever the question to be determined is the result of the common experience of all men of ordinary education, or is to be inferred from particular facts, the inference is to be drawn by the jury, and not by the witness.'" *Burch v. Valley Motor Lines, Inc.*, 179 P.2d 47, 78 Cal. App.2d 834 (1947).

The effect of this second requirement of § 74–2–8, supra, is to impose the duty of proving a negative on the applicant for a variance. The courts have recognized the difficulty of such a task and ruled accordingly.

"[A] party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of counter testimony, will afford reasonable ground for presuming the allegation is true; and when this is done the *onus probandi* will be thrown on his adversary." *Shumak v. Shumak*, 332 N.E.2d 177, 30 Ill.App.3d 188 (1975).

"Evidence which renders the existence of the negative probable may be sufficient in the absence of proof to the contrary. Jones on Evidence, § 178. * * * 'Full and conclusive proof, however, when a party has the burden of proving a negative, is not required, but even vague proof, or such as renders the existence of the negative probable, is in some cases sufficient to change the burden to the other party.'" *In re Chicago Rys. Co.*, 175 F.2d 282 (7th Cir. 1949).

"Where the burden of proof of a negative fact normally rests on one party, but the other party has peculiar knowledge or control of the evidence as to such matter, the burden rests on the latter to produce

such evidence, and failing, the negative will be presumed to have been established." *Allstate Finance Corporation v. Zimmerman*, 330 F.2d 740 (5th Cir. 1964).

█ The words "opacity of 20 per cent" as used in Regulation 402, and the word "smoke" as used in § 74–2–2, supra, in and of themselves indicate nothing as to whether the air is so polluted as to be "injurious to health or safety." Smoke, in a given situation, may be composed of elements which at a given density or opacity may be "injurious to health or safety", but something more than the percentage of opacity must be shown. As was stated in *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375 (D.C.Cir. 1973): "It may be * * * that the opacity test is an important enforcement tool * * *. However, it is one thing to use a method of testing to observe possible violations of a standard; it is another to constitute that method as the standard itself." There is also the question of whether or not the testimony of the smoke reader should be given much weight.

[A] test conducted for the National Center for Air Pollution Control (U.S. Dept. H.E.W.), where six trained smoke inspectors evaluated a white training plume known to have 0% opacity. All six inspectors rated the plume at more than 0% opacity and 3 evaluated it at more than 20%. A plume known to be at 20% opacity was rated higher than 20% by 5 of the 6 inspectors (one rated it lower) and 2 of them rated it at almost 40%.

As to whether wood smoke is injurious to human health, at least one study seems to indicate not.

In Papua New Guinea chronic lung disease is common in both sexes from middle age onwards * * *. Acute pneumonia has a high incidence and is a leading cause of hospital admissions and hospital deaths in adults and children. This picture, together with British evidence of a connection between early childhood experience and subsequent respiratory disease led to the theory that adult chronic lung disease may be caused by repeated or severe childhood chest infections.

A previous study of 1200 children aged 0–14 years sampled from 52 areas reported that highlanders had less respiratory disease than lowlanders and on this basis it was concluded that domestic wood smoke was not an important factor. * * In this study, 112 children who attended the same village school but who differed in their exposure to domestic wood smoke were examined each week over a thirty week period.

*    *    *    *    *    *

[F]our classes were examined once a week for loose cough, cough complaint and nasal discharge. * * * There were two groups: 1) 87 children from surrounding villages who were exposed each night to wood smoke from domestic fires; 2) 25 children from the adjacent Lufa Administrative Station whose parents were public servants and who lived in permanent materials houses which were free from internal pollution (except cigarette smoke). * * * Smoke concentrations were highest in the early evening when they ranged from 0.8 to 11.2 mg/m$^3$. Between 8 and 10 pm the range was 0.8 to 7.3 mg/m$^3$ but by late evening samples drawn from the sleeping areas were usually under 1 mg/m$^3$. The mean concentration in the sleeping area over the entire period 6 pm to 4 am ranged from 0.57 to 1.98 mg/m$^3$. These results are in general agreement with those of Cleary and Blackburn (22) who, using a different method elsewhere in the highlands, found a mean smoke concentration of 0.67 mg/m$^3$. The mean concentration of aldehydes, an important gaseous component of wood smoke was 1.08 ppm.

Based on the smoke measurements between 6 pm and 4 am, mean 24 hour exposure is probably from 0.3 to 0.8 mg/m$^3$. * * *

*    *    *    *    *    *

The school study in the highlands provides further evidence that exposure to wood smoke, which is the most prominent environmental difference, is not associated with respiratory disease. * * * Anderson, H. R. Respiratory Abnormalities

in Papua New Guinea Children—International Journal of Epidemiology 1978, 7: 63–72.

This matter is remanded with instructions to the Board to conduct further proceedings to determine whether the wood smoke, in the volume being emitted from appellant's wigwam burner is "injurious to health or safety." If it is determined not to be injurious, the Board is ordered to grant the variance.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

The order of the Board should be reversed and vacated because it was not rendered in accordance with law.

*Introduction.*

On February 8, 1979, Duke City filed its petition for variance from AQCR 402(A) in order to allow it to exceed 20% opacity in emissions from the Cuba and Espanola incinerators. The period of time desired was one year. This period of time expired February 8, 1980. Presently nine months have passed beyond the expiration date.

A public hearing was held June 28, 1979 and an order was entered October 12, 1979. A variance was granted for the Cuba facility, but not for Espanola. On appeal, Duke City was granted a stay of enforcement of Regulation 402 pending appeal. Duke City may have had some 21 months in which it was allowed a variance from AQCR 402(A) and it may have exceeded 20% opacity in its emissions.

A question arose whether the appeal may have become moot. Upon suggestion that this matter be called to the attention of the parties for an explanation, the panel refused.

This dissenting opinion is written absent a determination whether the period of time desired has expired.

A. *The order entered was not in accordance with law.*

If the period of time for which a variance is desired has not expired, the order of the Board should be reversed and vacated because it was not rendered in accordance with law. The order was void for five reasons:

(1) The Board was without authority to hold a public hearing.

Section 74–2–8(D), N.M.S.A.1978 reads:

Any person seeking a variance shall do so by filing a petition for variance with the director. The director shall promptly investigate the petition and make recommendation to the board as to the disposition thereof. *Upon receiving the recommendation of the director, the board shall, if the recommendation favors a variance, hold a public hearing* prior to the granting of any variance. If the board is opposed to the granting of the variance, then a hearing shall be held upon the request of the petitioner, and in such hearing the burden of proof shall be upon the petitioner.

After Duke City filed its petition, the director made an investigation. On March 22, 1979, the director recommended to the Board that the division did not favor granting the requested variance for the Espanola facility.

Despite the unfavorable recommendation of the director, the Board initially, at a meeting held April 20, 1979, favored granting Duke City's petition and scheduled the petition for hearing in Espanola on June 7, 1979, but postponed the hearing until June 28, 1979. The Board did not then oppose the variance. Only Duke City could request a hearing. It did not do so. At the hearing then held, the hearing officer announced:

This is a public hearing of the New Mexico Environmental Improvement Board.

Section 74–2–8(D), in mandatory language, ordered the Board to hold a public hearing only "if the recommendation favors a variance." The director's recommendation was unfavorable. The Board, therefore, was without authority to hold the meeting.

Subsequently, on October 12, 1979, the chairman of the Board entered an order that denied the variance requested for the Espanola facility. This order was not in accordance with law.

(2) The order does not show concurrence of three members of the Board.

Section 74–2–3 provides that "a majority of the environmental improvement board constitutes a quorum, but any action, order or decision of the environmental improvement board requires the concurrence of three members present at a meeting." The order does not show concurrence of three members present at the meeting in which the order was entered. This appears to be a jurisdictional question. If less than three members concurred, the order of the Board was invalid. *Petition of Kinscherff*, 89 N.M. 669, 556 P.2d 355 (Ct.App.1976). A concurrence not having been shown in the record, the order entered was not in accordance with law.

(3) The Board did not consider essential factors in its denial of the variance.

Section 74–2–8(B) reads:

B. *No variance shall be granted* pursuant to this section until the board has considered the relative interest of the applicant, other owners of property likely to be affected by the discharges *and* the general public. [Emphasis added.]

These provisions are mandatory. There is no indication in the order that the Board considered the three factors mentioned. What meaning can be given to these vague and uncertain concepts is a matter of guess and speculation. The order was not in accordance with law.

(4) An incomplete hearing does not meet statutory requirements of a public hearing.

The hearing officer announced:

* * * The Board granted the variance requests at their April meeting *and also that the record be held open for a period of time after today's hearing to allow those who could not attend to send in statements for the record. * * * will decide at the end of this hearing how long that record will remain open * * *.*

At the close of the case, the hearing officer stated:

In accordance with the Chairman's instructions, this record will be kept open for *additional written testimony only*, to be presented to the Environmental Improvement Board, for thirty days after today. * * * [Emphasis added.]

The hearing was incomplete.

After the adjournment on June 28, 1979, the Board accepted as "written testimony," a series of letters written contra the position of Duke City and a lengthy Duke City "Statement For The Public Record Regarding Variance Petitions Of Duke City Lumber" and a report attached thereto. This was not written testimony.

The words "public hearing" mean completed public hearing as distinguished from an adjourned hearing. The Board was without authority to enter an order on an incompleted public hearing and this Court will refuse to enforce the order. *In re Atchinson, T. & S. F. Ry. Co.'s Protest of Rates*, 44 N.M. 608, 107 P.2d 123 (1940); *Mountain States Tel. & Tel. Co. v. State Corp. Com'n*, 65 N.M. 365, 337 P.2d 943 (1959). Both cases were followed in *North State, Astor, Etc., Ass'n v. City of Chicago*, 131 Ill.App.2d 251, 266 N.E.2d 742 (1970), and *Mayfield Gas Company v. Public Service Commission*, 259 S.W.2d 8 (Ky.1953).

The "public hearing" was not held in accordance with law.

(5) The board failed to make findings essential to deny the variance.

Section 74–2–8(A) reads:

A. The board *may* grant an individual variance from the limitations prescribed * * * whenever it is found, upon presentation of adequate proof, that compliance with any part of that act * * * will result in an arbitrary and unreasonable taking of property *or* will impose an undue economic burden upon any lawful business * * * *and* that the granting of the variance will not result in a condition injurious to health or safety. [Emphasis added.]

The Board made the following findings:

(1) There was a great deal of community objection to emissions from the Espanola facility.

(2) The Board has been very patient with Duke City over the years.

(3) Although Duke City has made strides toward solving the woodwaste problem, the hearing record does not support the variance petition.

(4) The record shows that other alternatives are available.

The Board failed to make any essential findings. The order entered was not in accordance with law.

It must be noted that a grant of an individual variance from the limitations prescribed rests within the discretion of the Board. This is a powerful weapon placed in its hands. Even though Duke City established all of the factors essential to procure a variance as a matter of law, the Board was not mandated to grant the variance. It *may* do so upon compliance with the statutes. Can we say the Board abused its discretion in denying Duke City a variance? Did the Board act beyond the bounds of reason?

We are committed to the rule that courts are vested with power and authority to set aside an order of an administrative body if it is unreasonable, unlawful, arbitrary, capricious, or not supported by evidence. *Ferguson-Steere Motor Co. v. State Corp. Com'n*, 63 N.M. 137, 314 P.2d 894 (1957). Regardless of any discretion exercised by the Board, if its order is not in accordance with law, it is unlawful and can be set aside.

I agree that "The authority of the Board * * * should be construed as a narrow exception to the Board's duty to prevent or abate air pollution, and should not be lightly exercised," but it must be exercised in accordance with law.

B. *The burden of proof did shift to EID.*

Section 74–2–8(D), N.M.S.A.1978 provides that "in such [variance] hearings the burden of proof shall be upon the petitioner." Procedures used in the adoption of regulations require a public hearing. Here, "the board shall allow all interested persons reasonable opportunity to submit data, views or arguments orally or in writing and to examine witnesses testifying at the hearing." Section 74–2–6. Burden of proof is not required at this public hearing. We can deduce that since no petition is filed and no issue has been presented, no person appearing has any burden to carry before the Board.

"Public Hearing" is not defined in the Act when a party seeks a variance. "The term 'public hearing' has consistently been held to require that the hearing include the right to appear and give evidence and also the right to hear and examine witnesses whose testimony is presented by opposing parties." *People ex rel. Endicott v. Huddleston*, 34 Ill.App.3d 799, 340 N.E.2d 662 (Ct. App.1975).

In the instant case, Duke City filed a petition to secure a variance. At the hearing, the division attorney for the Environmental Improvement Division (EID) announced that he would "be representing the Environmental Division at this hearing. The hearing proceeded with Duke City and EID as opposing parties. Testimony was presented by both parties in the same manner that any civil case is tried in the district court.

EID claims that Duke City made a "startling statement" that the burden shifted to EID. It said:

The statute does not provide for shifting of the burden of proof. In fact, there is no requirement that EID even participate in the hearing. * * * [Emphasis added.]

Of course, EID was not required to participate in the hearing. EID could have absented itself and defaulted. Why, then, did EID strongly defend the public and seek to destroy the burden placed on Duke City? Why did EID complain that Duke City failed to cite any of EID's testimony regarding one point? If not "burden of proof" or "going forward with the evidence," what name will EID place upon its presentation of evidence? Its attempt to

transform a full fledged public hearing into a show acted by Duke City alone, expressed the zeal with which EID sought to protect the investigation and recommendation of its director. The Board was not impressed with the lengthy findings of the director because it did not follow them in its order. Neither was it impressed with the witnesses who testified for EID. The Board felt that it had been patient with Duke City and no more favors would be granted.

When Duke City met its burden of proof, and EID went forward with its evidence, the burden of going forward, figuratively, may be described as a "shifting" of the burden. It means nothing more than a deviation of the burden of presenting evidence in the progress of the hearing.

True, the statute did not provide for "shifting" the burden of proof; neither do the Rules of Civil Procedure. A statute which creates a public agency, with a public hearing included, does not, and cannot, control the conduct of opposing lawyers in the presentation of evidence. To suggest that a statute should provide that going forward with the evidence shifts the burden of proof is naivete.

When EID went forward with its evidence to disprove the validity of Duke City's desire for a variance, the burden did "shift" to EID. If EID had not proceeded, Duke City's petition would have been established by uncontradicted and undisputed facts.

EID, in its continued zeal to defeat Duke City, claims that letters mailed in at the request of the Board, after the hearing has been adjourned, *were relevant, material and admitted without objection* and may be treated as *legal evidence*. Under the circumstances shown, this contention is without merit.

The Environmental Improvement Act and the Air Quality Control Act are deficient in many respects and create many problems because neither the Board nor the Division would agree to be bound by the "Administrative Procedures Act," §§ 12–8–1, N.M.S.A.1978, et seq. As stated on several occasions, state agencies must have influenced the adoption of and preserved the legislative enactment pertaining to the applicability of the Act. Section 12–8–23 reads in pertinent part:

> The provisions of the Administrative Procedures Act apply to agencies made subject to its coverage by law, or by agency rule or regulation if permitted by law.

This Act was adopted in 1969. To date no state agency has been subject to its provisions. For over a decade, it has been a dead letter in the judicial process. Until the legislature makes the Act applicable to every agency, the conduct of state agencies will continue to be, from time to time, an affront to persons, firms and corporations subjected to the whim and caprice of those who administer it.