664 P.2d 365

**SECURITY MUTUAL CASUALTY COMPANY, Plaintiff-Appellant,**

**v.**

**James F. O'BRIEN and O'Brien Enterprises, Inc.; Pegasus Aerial Sports, Inc.; Judith A. McKinney As Personal Representative of the Estate of John L. McKinney, Deceased; Jack E. Johnson, Howard H. Irby and John L. McKinney, Deceased, d/b/a Aero Enterprises; Rodney Jones; Sky Scene, Inc.; and Robert Ellsworth, Defendants-Appellees.**

**No. 5358.**

Court of Appeals of New Mexico.

Aug. 3, 1982.

Carl J. Butkus, Civerolo, Hansen & Wolf, P.A., Albuquerque, Hugh C. Griffin, Lord,

Bissell & Brook, Chicago, Ill., for plaintiff-appellant Security Mut. Cas. Co.

Paul S. Wainwright, Robinson, Stevens & Wainwright, Albuquerque, for defendant-appellee Jones.

Charles Larrabee, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for plaintiff in intervention-appellee Proprietors Ins. Co.

John A. Mitchell, Mitchell, Alley & Rubin, Santa Fe, for defendants-appellees O'Brien and O'Brien Enter., Inc.

Farrell LaVar Lines, Lamb, Metzgar & Lines, P.A., Patrick Chowning, Albuquerque, for defendant-appellee Ellsworth.

Michael Watkins, Dickson, Dubois, Caffrey & Cooskey, P.A., Albuquerque, for defendant-appellee Sky Scene, Inc.

Timothy M. Padilla, Albuquerque, for defendant-appellee Pegasus Aerial Sports, Inc.

William S. Ferguson, Levy, Ferguson & Grady, P.A., Albuquerque, for defendants-appellees McKinney, et al.

## OPINION

SUTIN, Judge.

Security Mutual Casualty Company (Security) appeals from a Declaratory Judgment in which its aviation insurance policies were held to afford coverage. We affirm.

On April 5, 1979, Security issued two insurance policies to James F. O'Brien and O'Brien Enterprises, Inc. (O'Brien). These policies covered the operation of a Boeing B 75N1 Stearman Aircraft owned by O'Brien. Policy No. 14446–01C provided hull coverage. Policy No. 14446–02C, in which Pegasus Aerial Sports, Inc. (Pegasus) was named as an additional insured, provided liability coverage.

O'Brien leased the aircraft to Pegasus. Pegasus rented the aircraft to Ellsworth. On July 14, 1979, upon landing at Coronado Airport in Albuquerque, the Stearman, piloted by Ellsworth, collided with another aircraft. The parties stipulated that the collision had nothing to do with Stearman's

mechanical operation. It was in an airworthy condition. All routine maintenance had been performed.

To defeat coverage, Security relied upon two exclusions. In the hull policy, the exclusion reads:

THIS POLICY DOES NOT APPLY:— ... (d) while the aircraft is in flight, unless its *Airworthiness Certificate* is in full force and effect. [Emphasis added.]

In the liability policy, the exclusion reads:

THIS POLICY DOES NOT APPLY:— ... (2) While the Aircraft is in flight, unless its *Airworthiness Certification* is in full force and effect. [Emphasis added.]

The policies did not define "Airworthiness Certificate", "Airworthiness Certification" or "in full force and effect." No mention was made of "maintenance," "inspection," "Federal Aviation Regulations" (FARS), "Federal Aviation Law" or "Civil Air Regulations." The policies defined "Civil Aeronautics Authority" as the "duly constituted authority of the United States of America." "It is the policy, not the ... [airworthiness] certificate nor the FAA regulations, that sets the perimeters of insurance coverage." *Ranger Insurance Company v. Culberson,* 454 F.2d 857, 861 (5th Cir.1971); *National Aviation Underwriters v. Altus Flying,* 555 F.2d 778 (10th Cir. 1977). To avoid any uncertainty, FARS will be considered in arriving at affirmance.

The trial court made extensive findings of fact and conclusions of law. The pertinent findings and conclusions are summarized.

The Stearman aircraft had a Standard Airworthiness Certificate on March 23, 1976, and was in an airworthy condition. The parties stipulated that the collision had nothing to do with the mechanical operation of the Stearman. "Airworthiness Certification" had a different meaning than "Airworthiness Certificate." Neither had been surrendered, suspended, revoked or terminated.

Both exclusions were inherently ambiguous, vague and unclear. They were not spelled out with precision and did not clearly state the conditions which would make them operative. They were susceptible to different constructions, and were confusing to a reasonable person. Prior to flying the aircraft, the exclusions placed unreasonable burdens upon insured or any other person to determine the existence or non-existence of coverage and were an attempt to incorporate in the policy as an exclusion, a breach of FARS, not referred to, defined or incorporated in the policies.

The log books and maintenance records were the best evidence concerning maintenance of the aircraft. They were in the possession of Coronado Skyways (Sky Scene, Inc.) but Security never attempted to secure the records by deposition or subpoena.

Security did not show that it was substantially prejudiced by the alleged breach of the exclusions and O'Brien did not prejudice Security by acts and conduct. O'Brien did not breach the policies materially or in any other way.

The trial court concluded that (1) the liability coverage was in force; (2) the exclusions were ambiguous; (3) there was no causal connection between the accident and the exclusionary language, no prejudice having been shown; and (4) O'Brien did not materially or in any other way breach the policies.

Security claims:

A. It proved that a timely annual inspection had not been performed. Therefore the exclusions were in full force and effect.

B. There was no ambiguity in the exclusions.

C. The ruling on causal connection was erroneous.

D. The ruling on substantial prejudice was erroneous.

A. *Security failed in its proof of its negative facts.*

On August 30, 1979, Security filed its complaint. It alleged that the Airworthiness Certificate was not in full force and

effect as of the date and time of the collision. No mention was made of "Airworthiness Certification." It now claims if there was a distinction, it was a distinction without a difference. We disagree.

With reference to the liability policy, the exclusion was operative if the "Airworthiness Certification . . . [was not] in full force and effect." Security produced an expert witness with a commendable knowledge of FARS. On cross-examination he was asked these questions to which he made these answers:

Q. So the final act of Airworthiness Certification would be when FAA [Federal Aviation Administration] would issue to that aircraft its Standard Airworthiness Certificate?

A. Correct. It has to have that before it can fly.

Q. That would be your understanding concerning the terminology "Airworthiness Certification"?

A. *The certification process which I just described, yes, sir, culminates with the issuance of the Certificate.*

The witness described "Airworthiness Certification" as the required submission to FAA for acceptance, a plan that consisted of drawings for the construction of the aircraft, testing and tooling and completion in accordance with guidelines. In FARS it is called a "Production Certificate." 14 CFR 21.131 et seq.; 21.29 et seq.; 23.1 et seq. For Standard Airworthiness Certificates, see 14 CFR 21.171, et seq. Security has not pointed to any chapter or section of FARS where "Airworthiness Certification" appears. We have found no reference to it. The expert witness described "Airworthiness Certification" as a "Production Certificate" and this was its meaning in the exclusion clause of the liability policy.

The trial court found:

16. "Airworthiness Certification" has a different meaning than "Airworthiness Certificate" in that the former refers to the initial certification of an airplane upon its manufacture prior to sale to the general public.

17. Plaintiff [Security] has failed to establish by a preponderance of the evidence, that the Stearman's "Airworthiness Certification" had ever been revoked or suspended.

■ "Airworthiness Certification" is not an "Airworthiness Certificate," nor are they identical. There is a distinction with a difference. The exclusion in the liability policy is not governed by the FARS which apply to an "Airworthiness Certificate."

■ Security presented no evidence that the "Airworthiness Certification" of the Stearman aircraft was not in full force and effect at the time of the accident. The exclusion was not operative. Security is liable under Policy No. 14446–02C.

Under the hull policy, the exclusion was operative if the "Airworthiness Certificate . . . [was not] in full force and effect" at the time of the accident. The conditions under which it would be operative are not stated. The Stearman aircraft had an "Airworthiness Certificate" issued on March 23, 1976 by the Department of Transportation-Federal Aviation Administration. It stated that "as of the date of issuance, the aircraft to which issued has been inspected and found . . . to be in condition for safe operation . . . ." Its terms and conditions were:

"Unless sooner surrendered, suspended, revoked . . . this airworthiness certificate is effective as long as the maintenance . . . [is] performed in accordance with Parts 21, 43 and 91 of the Federal Aviation Regulations, as appropriate . . . ." [See, CFR Section 21.181.]

Part 21, entitled "Certification Procedures For Products and Parts," consists of 621 sections. No reference to maintenance appears. Part 43, entitled "Maintenance, Preventive Maintenance, Rebuilding And Alteration," consists of 17 sections and six appendixes. Part 91, entitled "General Operating And Flight Rules," consists of 311 sections and three appendixes. This is the only information furnished the insured. The Airworthiness Certificate calls into play hundreds of specific air regulations relating to every phase of aviation.

The Stearman Airworthiness Certificate had not been sooner surrendered by the insured nor suspended or revoked by the Department of Transportation. From March 23, 1976 forward, it served its purpose as long as Stearman was maintained in accordance with Parts 43 and 91.

The burden rested on Security to prove that the Stearman had not been so maintained prior to the accident. 14 CFR Section 1.1 defines "maintenance":

"Maintenance" means inspection, overhaul, repair, preservation and the replacement of parts, but excludes preventive maintenance.

Security claims that "maintenance" includes the timely performance of an annual inspection required by 14 CFR 91.169(a)(1)(2). They read:

(a) ... [N]o person may operate an aircraft unless, within the preceding 12 calendar months, it has had—

(1) An annual inspection in accordance with Part 43 of this chapter and has been approved for return to service by a person authorized by § 43.7 of this chapter; or

(2) An inspection for the issue of an airworthiness certificate.

Section 1.1 defines "person":

"Person" means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them.

Section 91.169(a) does not apply to O'Brien or Pegasus. Neither one was a "person" who operated the Stearman aircraft on the date of the accident. It was operated by Ellsworth, a renter of the aircraft. He "may" or "may not" operate it without a prior 12 months inspection. Operation was discretionary, not mandatory. It was undisputed that the Stearman aircraft was in an airworthiness condition. An inspection at any time prior thereto would have been a useless expense. It would have had no bearing upon the safety of the passengers or damage to the aircraft.

In fact, Security conceded that the collision had nothing to do with the mechanical operation of the Stearman. All routine maintenance had been performed. It would be foolhearty to hold that the Airworthiness Certificate was not in full force and effect absent an annual inspection while the aircraft was in an airworthiness condition. This Court does not sit blindfolded to give Security an escape hatch from liability. We hold that an annual inspection is not a condition precedent to a "person's" operation of an aircraft if the aircraft is in an airworthy condition.

Security also claims it proved that the Stearman aircraft had not had its required annual inspection timely performed in the months preceding this accident.

To determine whether an annual inspection had taken place, the log books and maintenance records would have been the best evidence but were not available at trial. They were last seen by the president of Pegasus in July, 1979, in the shop of Sky Scene, Inc. and seen by one mechanic in October, 1979. Sky Scene, formerly Coronado Skyways was located close to Pegasus at the Coronado Airport. The records were never returned to Pegasus. Security did nothing to locate the records until it procured an order to produce on December 4, 1979, some two months after the complaint was filed and 4½ months after the accident.

Following the accident on July 14, 1979, the record does not disclose any contact between Security and O'Brien, Pegasus or Ellsworth to locate the records. Neither was O'Brien called as a witness nor his deposition admitted in evidence. Nothing appears of record that insurance coverage was denied for any reason, including the lack of an annual inspection. Security produced no investigator or agent as a witness. Security had a duty to make a good faith investigation of the facts before it finally refused pay. When no effort is made by itself or its lawyer and the burden is left to the insured, Security has no just cause or refusal not to pay. *Dronge v. Monarch Ins. Co. of Ohio,* 511 F.Supp. 1 (D.C.Kan.1979).

The record is silent as to any investigation by or report of the accident to the National Transportation Safety Board. 49 U.S.C.A. § 1441; 49 CFR Parts 830, 831. "The National Transportation Safety Board thus is the governmental agency charged with the responsibility of investigating all civil aircraft accidents in the United States." 1 Aviation Tort Law § 1.16, Note 36, pp. 42–43 (1978). It is a matter of common knowledge that every aircraft accident of this nature is investigated and reported. For the broad admission in evidence of factual material contained in a report, see *Todd v. Weikle,* 36 Md.App. 663, 376 A.2d 104 (1977); *Murphy v. Colorado Aviation, Inc.,* 41 Colo.App. 237, 588 P.2d 877 (1978); *Indiana State Highway Com'n v. Rickert,* 412 N.E.2d 269 (Ind.App.1981); *State Comp. Ins. Fund v. City of Colo. Spgs.,* 43 Colo.App. 112, 602 P.2d 881 (1979).

█ Security failed to produce at trial the factual material present in the investigative report nor announce its absence. Neither did Security produce any documents of FAA that the Standard Airworthiness Certificate had been suspended, revoked or terminated. The burden of the evidence is on Security. Failing in this respect, we may assume that Stearman complied with FARS.

Security sought to prove that no annual inspection occurred for 1979. It called as witnesses the president of Pegasus and two mechanics who had worked on Stearman. One mechanic had performed a 1977 annual inspection. The other performed an annual inspection in April or May, 1978. Both testified that they did not know whether the Stearman had an annual inspection that would run through the date of the accident. If an annual inspection had been performed on July 15, 1978, it would have run through July 14, 1979, the date of the accident. Being in an airworthy condition on July 14, 1979, the month or two delay in 1978 was not vital or significant. It did not cause FAA to suspend, revoke or terminate the Standard Airworthiness Certificate.

The president of Pegasus testified that he had a regular maintenance program in 1978–79; that all of his airplanes were maintained on the basis of inspections becoming due on the airplanes; that he was not 100% positive that Stearman had its 1979 annual inspection and because he was not sure, he searched for the records to determine the fact.

Security argues that its burden in attempting to prove a "negative," i.e., the absence of a timely 1979 annual inspection was relaxed in *Duke City Lumber Co. v. N.M. Env. Imp. Bd.,* 95 N.M. 401, 622 P.2d 709 (Ct.App.1980). In stating various meanings of the "negative" rule, *Duke City* did not cite or discuss *Young v. Woodman,* 18 N.M. 207, 135 P. 86 (1913), followed in *Cantrell v. Buck,* 36 N.M. 208, 11 P.2d 961 (1932) and *Kuchan v. Strong,* 39 N.M. 281, 46 P.2d 55 (1935). *Young* stated the rule in New Mexico:

> [W]here the facts required to be shown are of a negative character, the burden of evidence may *sometimes* be sustained by proof rendering *probable* the existence of the negative fact, or the rule to the effect that where knowledge or means of knowledge are almost wholly with the party not having the burden of proof, *when all the evidence within the power of the moving party has been produced,* the burden of evidence may *sometimes* shift to the party having such knowledge or means of knowledge. *Neither of those rules excuses the party having the burden of evidence from showing, no matter with what difficulty, sufficient facts, necessarily inconsistent with the position of the adverse party, to cause the court to say that a prima facie case has been made out requiring explanation, in which event, such showing, in connection with silence on the part of the adverse party, may be sufficient to produce positive conviction in the mind of the court or jury.* [Emphasis added.] [Id. 18 N.M. at 210–11, 135 P. 86.]

*Woodman* stands for the proposition that (1) the burden of evidence "may sometimes be sustained" or "may sometimes shift" but (2) the burden is not sustained nor does it shift until the moving party [Security] pro-

duces all of the evidence within its power to prove a negative fact which is sufficient to establish a prima facie case and (3) if the adverse party [O'Brien-Pegasus] is silent, the evidence must be sufficient to produce a positive conviction in the mind of the trial court that the negative fact has been proven.

To prove that the Airworthiness Certificate was not in full force and effect, Security had a heavy burden. Repetition of what has been shown in this opinion is unnecessary. Security failed to establish the negative fact.

B. *The exclusion clauses were not operative; otherwise they were ambiguous.*

■ The exclusion clauses provided that the policies were not operative "unless its Airworthiness Certificate and its Airworthiness Certification" were in full force and effect. If they were in full force and effect, then the policy was operative and granted the insureds coverage. The certificate and certification are in full force and effect if they have not been revoked, suspended, surrendered or terminated. In this respect, the exclusion clauses are clear, not ambiguous. No such "if" events occurred. No documents or other evidence appear in the record to show that FAA took any action which affected the certificate or the certification. Neither did the insureds surrender the certificate nor admit the lack of certification. As a result, the certificate and the certification were in full force and effect at the time of the accident. *Ranger Insurance Company v. Phillips,* 25 Ariz.App. 426, 544 P.2d 250, 255 (1976) said:

As Bruner's student pilot certificate was not "surrendered, suspended or revoked" prior to the fatal crash, it remained a "proper" and "effective" certificate, notwithstanding the fact that Bruner may have conducted the flight in violation of Federal Air Regulations.

Clauses in a contract that are clear will be applied. *Alvarez v. Southwestern Life Insurance Co., Inc.,* 86 N.M. 300, 523 P.2d 544 (1974); *Walters v. Hastings,* 84 N.M.

101, 500 P.2d 186 (1972); *Davison v. Business Men's Assurance Co. of America,* 85 N.M. 796, 518 P.2d 776 (1974); *Cain v. National Old Line Insurance Company,* 85 N.M. 697, 516 P.2d 668 (1973). The exclusion clauses were not operative. They did not absolve Security of liability. The insureds had coverage.

Ambiguity arises when Security seeks to incorporate FARS in the exclusion clauses. Security assumes that an insured in an aviation policy is one educated in aviation law and FARS. An insured may be any "person" defined *supra,* who owns an aircraft operated by a pilot in command. This "person" reads the insurance clauses. No reference is made to aviation law or FARS. The insured is not alerted to the essential factors necessary to make the exclusion clauses non-operative.

*Read v. Western Farm Bur. Mut. Ins. Co.,* 90 N.M. 369, 374, 563 P.2d 1162 (Ct.App. 1977) says:

An insurance company has a duty to make policy provisions and words therein, especially those related to coverage [or exclusion], plain, clear and prominent to laymen.... A word that an insured cannot understand is a word of doubtful meaning and ambiguous ....

*Ranger Insurance Company v. Phillips* says:

For a policy exclusion to be effective, it is necessary that it spell out with precision the conditions which will make it operative. In referring only to the "effectiveness" of the airworthiness certificate, the policy fails to do so in this instance. [544 P.2d 256.]

"Airworthiness Certification" may mean that some method or process is used to ultimately certify that the aircraft was airworthy. "Airworthiness Certificate" may mean a document that certifies the aircraft to be airworthy. The meaning of both are doubtful because the insured does not know how or by whom certification is made nor how and by whom a certificate is issued. Both are ambiguous. "If an insurer would create an exception to the general import of

principal coverage clauses, the burden rests with him to phrase that exception in clear and unmistakable language." *Cobb v. Home and Auto. Ins. Co.,* 86 Cal.App.3d 673, 150 Cal.Rptr. 370, 374 (1978).

Apart from the hull policy, the Stearman had a Standard Airworthiness Certificate. The exclusion clause did not instruct the insured to read its certificate. But if we imposed this duty on an insured, which we do not, it would disclose that the certificate was effective so long as maintenance was performed in accordance with Parts 21, 43 and 91 of FARS. Reading would then impose a second duty on insureds to procure and read these voluminous and detailed FARS, a burdensome task. The parts are interrelated and complex. They are not plain and clear and would not convey to an insured the meaning of sections and subsections applicable to the exclusion clause. "[I]t is virtually impossible to have an accident of any type without being in technical violation of some FAA Rule, usually some part of 14 CFR Part 91 . . . ." 3 Aviation Tort Law § 29.27, p. 221 (1980); *Culberson, supra.*

Security knows or should know that insurance contracts are construed liberally in favor of the insured and strictly against the insurers; that this rule applies to exclusions in the policy; that words and phrases, unless defined to require some other meaning, will be given their ordinary meaning; that if an ambiguity is present, ambiguous words are construed more strongly against the insurer, all because the insurer prepared the policy, not the insured. *King v. Travelers Insurance Company,* 84 N.M. 550, 505 P.2d 1226 (1973). We protect the buying public who rely upon insurance companies and agencies in such transactions. *Mathews v. Ranger Insurance Company,* 281 So.2d 345 (Fla.1973). If a layman cannot understand the language in the policy in its full impact, the policy will be interpreted to yield its maximum protection consistent with policy language and the reasonable expectations of the insured. *Pribble v. Aetna Life Insurance Company,* 84 N.M. 211, 501 P.2d 255 (1972). An insured's reasonable expectation of coverage has been ap-

plied in an aviation liability policy. *Insurance Co. of North America v. Sam Harris Const.,* 22 Cal.3d 409, 149 Cal.Rptr. 292, 583 P.2d 1335 (1978). Two words, not defined, that are critical as to whether coverage existed, must be "ascertained by reference to the insured's reasonable expectation of coverage." [*Id.* 149 Cal.Rptr. at 293, 583 P.2d at 1336.]

At least one of the reasonable expectations of a layman is that the language of an exclusion in an aviation policy which denies him coverage will be plain and clear; that definitions of odd or unusual words and phrases will be included and that reference will be cited to applicable sections and subsections of parts of FARS. "Any intent to use. general words as a blunderbuss and every single regulation as birdshot cannot be reasonably upheld. If an insurance company has an intent to deny coverage in a specific set of circumstances, then it should so delineate." *Culberson,* 454 F.2d 865.

The exclusion clauses standing alone were not operative because the "Airworthiness Certification" and "Airworthiness Certificate" had not been surrendered, suspended, revoked or terminated. The exclusion clauses read together with FARS were ambiguous and as construed did not deny coverage to the insureds.

C. *Causal connection between exclusion clause and accident is essential to denial of coverage.*

It is undisputed that the Stearman aircraft was in airworthy condition and that its mechanical operation had nothing to do with the collision that occurred on July 14, 1979. If we assume that an annual inspection had not been made and, as a result, the Airworthiness Certificate was not in full force and effect, this breach did not contribute to the cause of the accident-loss nor did it increase the risk at the time of the accident. Thus, the exclusion clauses have no causal relationship with the accident-loss.

Security admits that there is no causal connection between the lack of an effective certificate or certification and the cause of

the accident. It "submits that causal connection is irrelevant to this case." By this statement, Security says that causal connection is not vital to its denial of coverage. Security is unconcerned that the exclusion clauses had nothing to do with the accident and loss. Multifarious exclusions unrelated to an accident could be used. In other words, if Security excluded coverage while the aircraft was in flight unless the exterior was painted blue and it was in fact painted white, which color had no causal connection with the accident and loss, it could deny coverage. An effective exclusion clause must be related to the accident. Otherwise it would not only be unfair to the insured but would be against the public interest as well. It is unreasonable to allow an insurer to deny coverage for reasons stated in an exclusion clause which do not relate to the accident and loss. "It should not be able to invoke an exclusion to provide itself a pure windfall of non-liability." *Am. States Ins. Co. v. Byerly Aviation, Inc.*, 456 F.Supp. 967, 970 (D.Ill.1978).

Security inserted the "Airworthiness Certificate and Certification" clauses to guard against the risk of loss that arises when the aircraft is not airworthy, i.e., not fit for operation in the air nor able to bear the strains of flight notwithstanding storms. Coverage should be denied whenever an insured flies its aircraft in an unairworthy or unsafe condition which condition causes the damage.

There are two cases which discuss an exclusion clause similar to that in the Security policy. *Ochs v. Avemco Ins. Co.*, 54 Or.App. 768, 636 P.2d 421 (1981) overlooked by the parties, and *Hollywood Flying Service v. Compass Ins. Co.*, 597 F.2d 507 (5th Cir.1979) which follows Florida law. Both cases affirmed denial of coverage.

Ochs appears to be directly in point. This was an action on an insurance policy for property damage to the insured aircraft. Defendant's motion for summary judgment was granted. Plaintiff was in the process of landing the aircraft. It ground-looped and flipped on its back. The cause of the accident was a defective or broken tail wheel spring. The exclusion clause was clear and unambiguous. The policy excluded coverage "to any aircraft, while in flight '(1) not bearing a valid and currently effective "standard" Airworthiness Category Certificate issued by the Federal Aviation Agency * * *.' " Plaintiff admitted that the aircraft did not bear such a certificate in that the aircraft did not have an annual inspection within the 12 calendar months prior to the accident as required by FARS. But plaintiff argued that the broken tail wheel spring and the absence of the Airworthiness Certificate have no causal relationship because the inspection required would not include the inspection of the tail wheel spring, and even if it did, a visual inspection would not necessarily reveal a defective spring. The aircraft was in a defective mechanical condition during flight and no annual inspection had been made. The court concluded:

We believe the better rule is that the insurer is entitled to exclude any liability for aircraft not bearing a valid and current airworthiness certificate. We hold that proof of causal connection between the cause of the accident and the policy exclusion is not required. [636 P.2d 424.]

In other words, Ochs holds that an Airworthiness Certificate is not valid and current if, while an aircraft is in an unairworthy condition during flight which caused the accident, an annual inspection had not been made; that proof of causal connection is not required when an unairworthy condition exists at the time of the accident, and the exclusion clause is operative. If the Oregon court meant that proof of a causal connection was irrelevant, we reject its holding.

In *Hollywood Flying Service*, Hollywood owned an aircraft that crashed into the Gulf of Mexico while rented for a flight to the Virgin Islands. It sought to recover the insured value under a policy issued by Compass. Compass denied liability to Hollywood on the basis of an exclusion in the policy which stated:

This Policy does not apply * * * to any Insured * * * who operates or permits

the operation of the aircraft, while in flight, unless its airworthiness certificate is in full force and effect [Id. 508.].

The trial court found that the certificate was not in effect because equipment required to maintain a certificate in effect was not in accordance with FAA requirements and the required aircraft manual was not aboard the aircraft. There was uncontradicted evidence that the fuel gauge on the plane was inoperative. There was evidence that the magnetic compass was not working; that the remote magnetic indicator was about 25% off course; that one generator was not functioning; that the fuel flow indicators were not working; and that the manual in the plane was not the approved manual. The court said:

The regulations prohibit flight of an aircraft registered in the United States unless all of its required components and systems are installed and working properly. See, e.g., 14 C.F.R. §§ 91.31(b), 91.-33(a) (1978). According to the uncontradicted expert testimony, if all required equipment is not in working order, the airworthiness certificate is suspended and doesn't regain full force and effect until the equipment is operating properly again. [Id. 508.]

Being controlled by Florida law, the court quoted a portion of Florida law that "There need be no causul connection between the non-compliance and the loss or injury." The court then continued:

It therefore does not matter that the cause of the crash is unknown and that no causal relationship has been established between the missing manual or the inoperative equipment and the loss of the plane. [Id. 508–9.]

*Hollywood Flying Service* held that the exclusion was applicable where the Airworthiness Certificate was not in full force and effect at the time of the crash because equipment required to maintain a certificate was not operative and the required manual was not aboard; it did not matter that the cause of the crash was unknown and no causal relationship had been established between the missing manual or the inoperative equipment and the loss of the plane.

*Ochs* and *Hollywood* stand for the proposition that proof of a causal connection between the exclusion clause and the accident-loss is not necessary where, due to a violation of FARS with respect to its mechanical operation, the Airworthiness Certificate is not in full force and effect. The rule does not apply where the aircraft is in an airworthy condition at the time of the accident.

Security relies primarily upon pilot certificate cases such as *Omaha Sky Divers Parachute C., Inc. v. Ranger Ins. Co.,* 189 Neb. 610, 204 N.W.2d 162 (1973); *Baker v. Insurance Company of North America,* 10 N.C. App. 605, 179 S.E.2d 892 (1971); and *Glades Flying Club v. Americas Aviation & M. Ins. Co.,* 235 So.2d 18 (Fla.App.1970). Cases of this nature would be applicable only to Ellsworth, the pilot, not to O'Brien and Pegasus, the insureds. Ellsworth was not a named insured. Security's liability policy contained no provision for FARS applicable to a pilot.

The question presented is whether the rule of causal connection announced in some pilot certificate cases should be adopted in Standard Airworthiness Certificate cases. We believe not. The rule of "causal connection" as applied to exclusions has had a turbulent history in automobile and aviation accidents. A split of authority has always existed.

*South Carolina Ins. Co. v. Collins,* 269 S.C. 282, 237 S.E.2d 358, 362 (1977) cited the above security cases and a host of others. It stated:

After examination of the decisions cited by the appellant, we find them unpersuasive. Only their number, not their reasoning, lends support to a reversal here. . . .

In view of the stipulation by the parties that there was no causal connection between the loss and injuries resulting from the crash and the failure of the insured to have a valid and effective *medical certificate* at the time of the

accident, we hold that the lower court acted correctly in awarding the relief sought by the respondents. [Emphasis added.]

*South Carolina Ins. Co.* follows the "trend of modern authority." *Bayers v. Omni Aviation Managers, Inc.,* 510 F.Supp. 1204 (D.Mont.1981). *Bayers* said:

The "trend of modern authority" is sound and will be followed by this court.... [I]t is undisputed that the alleged breach of the policy conditions had nothing to do with the accident. To deny the insured the coverage he had paid for where merely a technical breach occurred would be unfair. The company inserted the *medical certificate* provision to guard against the risk of loss which arises where a person of bad health pilots an aircraft. In this case, Richard White's lack of medical certification did not increase the risk of loss to the company, and the insured's coverage will not be forfeited because of an alleged technical breach of the policy. [Emphasis added.] [Id. 1207.]

See, *Davis,* "... to inform you that our aviation policy does not afford coverage ...." 36 Journal of Air Law and Commerce, 246, 258–60 (1970).

That which is the "trend of authority" in pilot certificate cases should apply to Airworthiness Certificates. The reason and purpose are the same.

Security relies upon *Peterson v. Romero,* 88 N.M. 483, 542 P.2d 434 (Ct.App.1975). *Peterson* held in passing that under a Hertz rental contract, wherein Hertz was granted summary judgment, a causal connection between a driver's age and the automobile accident did not have to be shown by Hertz. The reason was this omission did not create a material issue of fact. The cases cited show a split of authority over 40 years ago. *Peterson* was not intended to set a precedent that would deny coverage to insured in an aviation insurance policy where the exclusion clause had no causal relationship with the accident loss.

Based upon reason, common sense and purpose, we hold that an exclusion clause in an aviation insurance policy which requires an effective Standard Airworthiness Certificate does not deny coverage to an insured when a breach of one or more FARS have no causal connection with the accident. To hold otherwise would allow an insurer to insert a host of parts, sections and sub-sections of FARS as well as other insertions, innocuous or otherwise, to avoid liability. See *Woods v. Insurance Company of North America,* 38 Cal.App.3d 144, 113 Cal.Rptr. 82 (1974), 72 ALR.3d 515 (1976). Insurance coverage must not be erased from an insurance policy by an exclusion clause, the violation of which bears no relationship to an accident.

D. *The exclusion clauses were not enforceable.*

Exclusionary definitions in an insurance contract are to be enforced so long as their meanings are clear and do not conflict with statutory law. *Safeco Ins. Co. of America, Inc. v. McKenna,* 90 N.M. 516, 565 P.2d 1033 (1977); *Willey v. Farmers Insurance Group,* 86 N.M. 325, 523 P.2d 1351 (1974). If the exclusion clause is not clear, it cannot be enforced. "Clear" means "Obvious; beyond reasonable doubt; perspicuous; plain." Black's Law Dictionary (Rev. 4th Ed.1968) p. 317.

Do the words "unless its Airworthiness Certificate or Certification is in full force and effect" convey to the average insured layman beyond a reasonable doubt what this phrase meant? We think not absent definitions or explanations. An insured would have to be an experienced pilot in command and an expert in aircraft or one who specializes in airplane design and construction. It was not obvious to the district court nor is it to any ordinary insured person as to what elements of design and construction are essential to produce an effective airworthy certification or a certificate that follows certification. "Airworthiness Certification" is unknown to FARS but known to an expert.

Not being clear, the exclusion clauses were not enforceable.

E. *Security failed to show any prejudice.*

*Foundation Reserve Ins. Co. v. Esquibel,* 94 N.M. 132, 134, 607 P.2d 1150 (1980) said:

We hold that the insuror [sic] must demonstrate substantial prejudice as a result of a material breach of the insurance policy by the insured before it will be relieved of its obligations under a policy.

The burden of proof rests on the insurer. If we assumed that the exclusion clause was breached due to the absence of an annual inspection, Security would have to show not only that it was a material breach but also that it substantially prejudiced Security. Security did not discuss this subject. It claimed that the trial court's finding and conclusions in this regard were irrelevant because *Foundation Reserve* was severely limited by *Sanchez v. Kemper Ins. Companies,* 96 N.M. 466, 632 P.2d 343 (1981). Security is mistaken. *Sanchez* involved an affirmative defense that plaintiff failed to file suit within one year of the date of the loss as required by the insurance contract. It held that prejudice need not be shown for a time-to-sue provision because "the purpose of a time-to-sue provision is not necessarily fear of prejudice to the insurer." [Id. 468, 632 P.2d 343.] "[R]equiring an insurer to show prejudice is appropriate because today's insurance contract is furnished to an insured on a take-it-or-leave-it basis." [Id. 468, 632 P.2d 343.]

 Security was not relieved of its obligation under the policy because it failed to show substantial prejudice by reason of the alleged breach of the exclusion clause.

Affirmed. Security shall pay the costs of this appeal.

IT IS SO ORDERED.

LOPEZ and NEAL, JJ., concur.